Theresa THOMAS, Appellant

v.

TOWN OF HAMMONTON; Mayor and Council of the Town of Hammonton; Diane Decicco; County of Camden; Camden County Communications Center; Michael Howard.

No. 02–3983.

United States Court of Appeals, Third Circuit.

Argued Oct. 16, 2003.

Filed Dec. 4, 2003.

Mark Cimino (Argued), Deptford, NY, for Appellant.

A. Michael Barker (Argued), Barker, Douglass & Scott, Linwood, NJ, for Appellees Town of Hammonton, Mayor and Council of Hammonton, and Diane Decicco.

Lawrence Vecchio (Argued), Office of Camden County Counsel, Camden, NJ, for Appellees County of Camden, Camden County Communications Center, and Michael Howard.

Before SLOVITER, ROTH and STAPLETON, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge.

Appellant Theresa Thomas alleges that, while employed by the Town of Hammonton, New Jersey ("Hammonton"), she was subjected to sex discrimination and that her employment was terminated in retaliation for her complaints about that discrimination. The District Court granted summary judgments in favor of all the defendants, Hammonton, the Mayor and Council of Hammonton, Diane DeCicco, the County of Camden ("Camden County"), Camden County Communications Center, and Michael Howard. We will affirm all of these judgments except those pertaining to Thomas's claim of hostile

work environment sexual harassment under the New Jersey Law Against Discrimination ("LAD"). We will reverse and remand all of the District Court's judgments with respect to the LAD sexual harassment claims, except the one entered in favor of Diane DeCicco, which will be affirmed.

## I. The Standard of Review

Because we are called upon to review summary judgments, our review is plenary. *Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*, 343 F.3d 669, 679–80 (3d Cir.2003). We must view the record in the light most favorable to Ms. Thomas. *Id.* at 680.

## II. The Summary Judgment Record Viewed in the Light Most Favorable to Ms. Thomas

On April 2, 2000, Thomas began working on a provisional basis for the Town of Hammonton Police Department in the State of New Jersey as a 911 call center dispatcher. As a new dispatcher, Thomas was subject to a 90–day probationary period, during which time Hammonton could release Thomas from her employment with or without cause.[1] In June of 2000, Thomas was required to take a week-long training course run by Camden County and given at the Camden County Communications Center.

On June 5, 2000, Thomas arrived at the Camden County Communications Center to begin her training course. The course was taught by Michael Howard. Thomas and Nick DeStefano, a male, were the only students. Thomas alleges that within the first half hour of the class, the instructor, Howard, began harassing her. The sexually harassing conduct of Howard, according to Thomas, included the following: (1) using the words "jerk-offs, pricks, and pussies;" (2) using the word "bitch" as a synonym for problem; (3) distributing "dumb blonde" jokes to the class; (4) grabbing his own genital area several times;[2] (5) making a point of standing directly in front of Thomas (two to eight feet away) when acting offensively; (6) playing a tape of supposed 911 emergency calls for the class, and fast-forwarding to particularly sexually explicit parts; and (7) remarking "so that figures" to Thomas after he asked what she had for lunch and she indicated a hot dog. With the exception of the hot dog incident, Thomas's fellow student was present for all of these incidents.

The tape, purportedly consisting of actual 911 emergency calls, contained several calls of a non-sexual nature (including a call from a man who mumbles gibberish for several minutes to a dispatcher, a call regarding a fire, and a call from a man who gets into a car accident while on the phone with a dispatcher). The calls allegedly played to Thomas, however, included the following: (1) the caller indicates that he went to a doctor and the doctor asked him to "do some crazy shit and ... ejaculate." The caller then claims the doctor asked him if he was "getting hot and ... want to come;" (2) the caller indicates that her 15 year-old son put a combination lock on his testicles; (3) the caller says he "cut [his] cock off," apparently with a vacuum

---

1. Thomas does not concede that she was a provisional employee. Nonetheless, we agree with the District Court that even when viewing the evidence in the light most favorable to Thomas, Thomas was unquestionably subject to a 90–day probationary period during which she could have been dismissed with or without cause.

2. Specifically, Thomas testified as to one incident where Howard allegedly said that "he was a volunteer captain or something for a fire department, ... and that when firemen hear whistles go off, ... for a fire they get big massive hard ons and that's one of the times he grabbed himself...." Appellant's App. at 51.

cleaner; (4) a call between a dispatcher and an EMT discussing how the EMT had to transport a vacuum cleaner to the hospital with the patient; (5) a call between a dispatcher and another EMT after the vacuum incident describing how the caller was masturbating with an upright vacuum and how "it" got stuck in the vacuum and the vacuum cut "it" off; (6) the caller indicates that her husband has hair caught in his throat, the dispatcher asks what the husband was eating, and caller replies "me;" (7) the caller indicates that he has something "stuck in [his] ass" and tells the operator that the object is a dildo; and (8) the caller requests information regarding laws on nudity, indicating that she "know[s] in Washington, D.C. that women can go topless as long as they have their nipples covered."

Howard did not use the above tape in an instructional manner, but merely played the tape (often fast-forwarding to the sexually explicit parts), laughed, joked, and discussed how paramedics treating the vacuum victim found that his "peter" was like ground meat and ultimately could not be repaired. He additionally noted that the caller who had something stuck in his rectum had to have four hours of surgery as a result.[3]

Thomas attended the class for three days on June 5, 6, and 7, 2000, and for about five minutes on June 8, 2000. After the first day of the course on June 5, 2000,

Thomas complained to fellow Dispatcher Theresa Bradbury that Howard had been using foul language and lewd gestures. Bradbury offered to call a Camden County employee to complain for Thomas, but Thomas informed Bradbury that she had already said something to the instructor, that she needed the class for work, and that she "didn't want to create a big thing." Appellant's App. at 50.

After the behavior by Howard continued on June 6, 2000, Thomas approached Lt. Sean Locantore of the Hammonton Police Department, who was in the direct chain of command for the department's dispatchers. Thomas complained about Howard's inappropriate comments and gestures, and specifically complained about the tape of supposed 911 calls played by Howard. Lt. Locantore suggested that Thomas bring the matter to Hammonton Police Chief Ingemi and to Dispatcher Bradbury. Thomas indicated that she did not want to do so and risk that Howard might fail her. Lt. Locantore suggested that Thomas record the language used by Howard and attempt to obtain a copy of the tape of supposed 911 calls.

Returning on June 7, 2000, Thomas recorded part of the class taught by Howard. According to Thomas, Howard cursed and made obscene gestures (such as grabbing his crotch) during this class as well. Thomas stayed in the class at this point,

3. Appellees Hammonton and Camden County made a motion before this Court to have two audio exhibits included in Thomas's appendix–purporting to represent (1) the tape played by Howard supposedly consisting of actual 911 calls and (2) a recording by Thomas of part of Howard's class–excluded from the record on appeal. Appellees argue that these exhibits were not part of the record during the District Court summary judgment proceedings. Furthermore, Appellees note that they objected to the District Court's consideration of the audio exhibits on various grounds during summary judgment proceedings. We will deny the motion. The District Court's docket entries clearly show that the audio exhibits were part of the record. Moreover, the District Court specifically discussed the various contents of the audio exhibit of supposed 911 calls, indicating that the District Court had allowed the audio exhibit of 911 calls into the summary judgment record. Appellees did not cross-appeal the District Court's admitting these audio exhibits for summary judgment purposes.

and asked to borrow a copy of the tape of supposed 911 calls played by Howard during the previous class. Howard gave her the tape. Thomas returned to the Hammonton Police Department and advised Dispatcher Bradbury that she had a copy of the "training" tape.

A meeting with Thomas, Ingemi, Locantore, Bradbury, Deputy Chief Ness, and Lt. Jones eventually took place in Chief Ingemi's office that day. The Chief told her. "I can't tell you whether to go back or not go back." Appellant's App. at 68. Lt. Locantore told Thomas to leave the class if Howard was still teaching the next day. When Thomas arrived, Howard was in fact teaching the class and Thomas left. Thomas called Chief Ingemi, who informed her that she did not have to return to the class.

The next day, on Friday, June 9, 2000, Thomas reported for work at 7:00 a.m. and left for a previously arranged vacation at lunchtime. Thomas returned to work as scheduled on Monday, June 12, 2000, and also reported for work on Tuesday, June 13, 2000 and Wednesday, June 14, 2000. Thomas alleges that no one in the department talked with her during these last three days. On Wednesday, Thomas was given the 911 dispatcher certification test as a result of Chief Ingemi's having made alternate arrangements for Thomas to take the test. She passed. Wednesday, June 14, 2000, turned out to be Thomas's last day of work for the Hammonton Police Department.

Thomas called in sick for her scheduled shifts on June 16, 2000 and June 17, 2000, due to an upset stomach, vomiting, and anxiousness. She visited her physician on June 20, 2000, who advised her to stay out of work for a week and wrote a note indicating that she would be out of work through June 27, 2000. Thomas was scheduled to work on June 28, 29, and 30, 2000, but did not report to work. She alleges that she still felt sick and that for a few days prior to June 28, 2000 she was unable to contact her doctor, who was on vacation. According to Thomas, she contacted Lt. Locantore on June 26, 2000 and informed him that she was still sick. Lt. Locantore indicated that she would not be paid for her time out sick if she exhausted her sick days.

On June 26, 2000, a closed meeting of the Mayor and Council of the Town of Hammonton was held. Chief Ingemi reported to the Council that Thomas had made an accusation to him regarding sexual misconduct of a 911 instructor employed by Camden County.

On June 29, 2000, after Thomas had not reported for work on June 28 and 29, 2000, Diane DeCicco, the clerk/administrator of Hammonton, sent Thomas a letter terminating her employment without further explanation. The letter also informed Thomas that her health benefits would be terminated effective July 1, 2000, unless Thomas returned an enclosed COBRA form "as soon as possible" along with a "monthly payment" of $480.82. Appellant's App. at 26. Thomas did not seek to continue her benefits through COBRA.

## III.  *The Federal Claims*

Thomas alleges three federal claims: (1) she asserts that she was terminated in violation of her right to due process under the Due Process Clause; (2) she claims that she was terminated in retaliation for her complaint against Howard, thus violating her rights under the Free Expression Clause; and (3) she contends that Hammonton's notice of her right to continue her health insurance violated her rights under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"). The District Court granted summary judgment to

the defendants on each of these claims, and we will affirm.

### A. Procedural Due Process

■ There is no serious dispute that at the time of Thomas's termination she had been employed for less than 90 days and, accordingly, was a probationary "at-will" employee who could be terminated without cause. She nevertheless insists that under New Jersey law she could be terminated only by the City Council and only after notice and a hearing. These rights under state law, she maintains, gave her a property right protected by the Due Process Clause. We assume *arguendo* that she possessed these rights under New Jersey law. They did not, however, trigger the protection of federal procedural due process.

■ The Fourteenth Amendment to the United States Constitution prohibits states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Accordingly, the first step in analyzing a procedural due process claim is to determine whether the "asserted individual interests are encompassed within the fourteenth amendment's protection of life, liberty, or property." *Alvin v. Suzuki,* 227 F.3d 107, 116 (3d Cir.2000) (internal quotations omitted). Thomas claims only that she possessed a property interest in her job. The fact that she was an at-will employee is fatal to this claim, however. Once a determination has been reached by reference to state law that an employee "held [her] position at the will and pleasure of the city," that

finding "necessarily establishes that [the employee] had no property interest." *Bishop v. Wood,* 426 U.S. 341, 346 n. 8, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (internal quotations omitted); *see also Robertson v. Fiore,* 62 F.3d 596, 601 (3d Cir.1995) (per curiam) (at-will employee "lacks a protected property interest in his position within the meaning of the Fourteenth Amendment"); *Chabal v. Reagan,* 841 F.2d 1216, 1223 (3d Cir.1988) (same).

The fact that state law may grant procedural protections to an at-will employee does not transform his or her interest in continued employment into a property interest protected by the Due Process Clause. As the Supreme Court explained in *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985):

> The point is straightforward: the Due Process Clause provides that certain substantive rights – life, liberty, and property – cannot be deprived except pursuant to constitutionally adequate procedures. The categories of substance and procedure are distinct. Were the rule otherwise, the Clause would be reduced to a mere tautology. "Property" cannot be defined by the procedures provided for its deprivation any more than can life or liberty.[4]

### B. Free Expression

■ Thomas alleges that she was terminated from her employment with Hammonton in retaliation for complaining of Howard's sexual harassment in violation of

---

4. Contrary to Thomas's suggestion. *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), does not hold that state procedural protections can transform at-will employment into a protected property interest. There, a state statute created a substantive cause of action for employment discrimination on the basis of disability.

The chose-in-action thus created had been extinguished when the state failed to convene a hearing within 120 days as required by the statute. This extinguishment was held to be a deprivation of the plaintiff's property interest in his substantive employment discrimination claim.

her right to free expression under the First Amendment. The District Court granted summary judgment against her because she had not proffered evidence from which a reasonable jury could find a causal connection between Thomas's complaint and her termination. We agree.

Thomas insists that the decision to terminate her employment was made solely by Dianne DeCicco, Hammonton's female clerk/administrator. The undisputed record evidence reflects that this decision was announced on June 29th at the end of Thomas's 90–day probationary period. At that point, she had been absent for nine days during the month of June and had failed to call in on June 28th to advise that she would not report for duty. Appellees' Supp.App. at 61–63. It is in this context that Thomas would seek to persuade a trier of fact that a female administrator decided to terminate her employment because she had made a sexual harassment claim against an employee of another township.

Thomas's brief does not articulate a plausible theory under which her complaint against someone unassociated with DeCicco or her employer might have caused DeCicco to terminate her. And we have been unable to construct one from the sparse available evidence. Thomas has testified on deposition that the employees in the dispatch room "shunned" her when she returned to work on June 12 through 14, but this is of limited probative value as far as DeCicco's motivation is concerned. The only evidence regarding the attitude of the Town's supervisory personnel regarding Thomas at this point in time is the evidence that, despite her not having completed the training course, Chief Ingemi arranged for her to take the 911 operator certification test on June 14th.

We have recognized, to be sure, that a suggestive temporal proximity between the protected activity and the alleged retaliatory action can be probative of causation. *See Rauser v. Horn*, 241 F.3d 330, 334 (3d Cir.2001). However, "[e]ven if timing alone could ever be sufficient to establish a causal link, ... the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir.2003) (internal quotations omitted; alterations in original); *see also Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir.1989) (two days between protected activity and alleged retaliation sufficient to draw inference of causal connection). In cases such as this one where "the temporal proximity is not so close as to be unduly suggestive," we have recognized that "timing plus other evidence may be an appropriate test...." *Marasco*, 318 F.3d at 513 (internal quotations omitted).

Here, in the context of the record as a whole, the chronology of events does not provide substantial support for Thomas's position. The record does not disclose when DeCicco first learned of the complaint, and over three weeks passed between the complaint and the termination letter. Indeed, given the special arrangements for the June 14th test, Thomas's attendance record during the intervening three-week period, and the near-end of the probationary period on the date of the termination letter, the chronology of events far more strongly suggests a situation in which a probationary employee was determined to be a poor risk as far as dependability was concerned.

## C. COBRA

■ Thomas argues that Hammonton failed to comply with COBRA's notification requirements set forth in the Public

Health Services Act ("PHSA"), 42 U.S.C. § 300bb–6(4). COBRA amended, *inter alia,* both the PHSA and the Employee Retirement Income Security Act ("ERISA") with similar notification and continued coverage provisions. The COBRA provisions in the PHSA and ERISA represent parallel statutory schemes. However, ERISA excludes public employees covered by governmental employee benefit plans, 29 U.S.C. § 1003(b)(1), while the PHSA applies only to such employees. *See Brett v. Jefferson County, Ga.,* 123 F.3d 1429, 1434–35 (11th Cir.1997). In addition, the relief available under ERISA for violations of COBRA notification requirements is broader than the relief available under the PHSA for the same violations.

Both the PHSA and ERISA allow a beneficiary to bring an action for "appropriate equitable relief" to redress ERISA and PHSA violations such as the failure of a plan to provide proper COBRA notice. 29 U.S.C. § 1132(a)(3) (ERISA); 42 U.S.C. § 300bb–7 (PHSA). However, unlike the PHSA, ERISA specifically provides for fines and attorney's fees. *See* 29 U.S.C. § 1132(c) and (g).

Section 300bb–6(4) of the PHSA requires a plan administrator to provide a beneficiary notice of his or her COBRA rights upon the happening of a qualifying event. 42 U.S.C. § 300bb–6(4). Termination of employment is a qualifying event. *Id.* § 300bb–3(2). COBRA provides that a terminated employee shall have 60 days to elect continuation coverage and that a plan may not require a premium to be paid sooner than 45 days after the day on which a beneficiary elects such coverage. *See* 42 U.S.C. §§ 300bb–5(a) and 300bb–2(3).

The notice provided to Thomas on June 29, 2000 stated,

> [B]e advised your health coverage will be terminated effective 7/1/00. I have enclosed for your convenience a COBRA form. If you are interested in continuing your health benefits through COBRA, please return this form to my office as soon as possible together with the monthly payment of $480.82 made payable to the Town of Hammonton.

Appellant's App. at 26.

We, along with other courts, have required employers to operate in "good faith" compliance with a reasonable interpretation of the notification provisions of COBRA. *See Williams v. New Castle County,* 970 F.2d 1260, 1265 (3d Cir.1992); *see also, e.g., Degruise v. Sprint Corp.,* 279 F.3d 333, 336 (5th Cir.2002) ("employers are required to operate in good faith compliance with a reasonable interpretation of what adequate notice entails") (internal quotations omitted); *Smith v. Rogers Galvanizing Co.,* 128 F.3d 1380, 1383–84 (10th Cir.1997) (same). While COBRA notice givers are thus not held to literal compliance with the statute, we agree with the District Court that Thomas received improper notice of her COBRA rights because Hammonton failed to "properly detail her right to have up to 60 days to elect to continue her coverage and another 45 days from then to make payment." District Court Op. at 20. Hammonton required Thomas to elect coverage and pay her premium "as soon as possible." This was in direct conflict with COBRA.

Nevertheless, as the District Court correctly noted, the PHSA provides only for "appropriate equitable relief" to redress such COBRA violations. *See* 42 U.S.C. § 300bb–7. Thomas has not suggested any appropriate equitable relief and, indeed, has not directed us to anything in the record tending to show that she was harmed in any way by Hammonton's failure to provide a proper notice. Thomas cites to *Phillips v. Riverside, Inc.,* 796 F.Supp. 403 (E.D.Ark.1992), where a Dis-

trict Court allowed for statutory fines and attorney's fees because of improper CO-BRA notice. However, *Phillips* involved a private employer, and fines and attorney's fees were authorized under the specific provisions of ERISA, 29 U.S.C. § 1132(c) and (g). As we have indicated, they are not available under the PHSA.[5]

Accordingly, we will affirm the District Court's grant of summary judgment to Appellees on Thomas's COBRA claim.

## IV. *The State Claims*

Thomas asserts three claims under state law. First, she alleges that her termination violated both New Jersey's Law Against Discrimination ("LAD"), N.J. Stat. Ann. § 10:5–12(d), and its Conscientious Employee Protection Act ("CEPA"), N.J. Stat. Ann. § 34:19–3, because it was in retaliation for her complaints of sexual harassment. Second, she maintains that the LAD was violated by the sexual harassment she received.

## A. Retaliation

■ A cause of action for retaliatory discharge under both the LAD and CEPA requires the showing of a causal link between the protected activity and the discharge. These claims accordingly fail for the same reason that Thomas's federal, free expression claim fails. *See* II–B, *supra.*

### B. Sexual Harassment

The New Jersey Supreme Court has developed a four-part test for hostile work environment sexual harassment under the LAD:

> To state a claim for hostile work environment sexual harassment, a female plaintiff must allege conduct that occurred because of her sex and that a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile, or offensive working environment. For the purposes of establishing and examining a cause of action, the test can be broken down into four prongs: the complained-of conduct (1) would not have occurred *but* for the employee's gender; and it was (2) *severe or pervasive* enough to make a(3) *reasonable woman* believe that (4) the conditions of employment are altered and the *working environment is hostile or abusive.*

*Lehmann v. Toys 'R' Us, Inc.,* 132 N.J. 587, 626 A.2d 445, 453 (1993) (emphasis in original).

With respect to the first element of the test, the *Lehmann* Court explained that the "but-for" the employee's gender element,

> ... simply requires that in order to state a claim under the LAD, a plaintiff show by a preponderance of the evidence that she suffered discrimination

---

5. We do not interpret "appropriate equitable relief" in the PHSA, 42 U.S.C. § 300bb-7, to allow public employees to seek fines and attorney's fees. Congress specifically provided for such relief under ERISA, but did not do so under the PHSA. *See Brett,* 123 F.3d at 1435. Such an interpretation is consistent with the Supreme Court's narrow interpretation of "appropriate equitable relief" under Section 502(a)(3), 29 U.S.C. § 1132(a)(3), of ERISA, in *Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d

635 (2002). In *Great–West,* the Court reiterated that "appropriate equitable relief" in Section 502(a)(3) is to be narrowly interpreted as providing for "those categories of relief that were *typically* available in equity." *Id.* at 210, 122 S.Ct. 708 (quoting *Mertens v. Hewitt Associates,* 508 U.S. 248, 256, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993)) (internal quotations omitted). Injunction, mandamus, and equitable restitution were the categories of relief typically available in equity. *Great–West,* 534 U.S. at 215, 122 S.Ct. 708.

because of her sex. Common sense dictates that there is no LAD violation if the same conduct would have occurred regardless of the plaintiff's sex. For example, if a supervisor is equally crude and vulgar to all employees, regardless of their sex, no basis exists for a sex harassment claim. Although the supervisor may not be a nice person, he is not abusing a plaintiff because of her sex. *Id.* at 454.

The District Court held that because Howard, with one exception, was equally crude with respect to both Thomas and DeStefano, her fellow male student, the record would not support a finding that the hostile environment created by Howard would not have existed but for Thomas's gender. The Court acknowledged that Howard's comment regarding Thomas's choice of a hot dog for lunch did not occur in the presence of her fellow student, but concluded that this one comment alone could not satisfy the second prong of the *Lehmann* test, which requires that the conduct be "severe or pervasive." 626 A.2d at 453.

We agree that a reasonable trier of fact might conclude that Howard would have created the same environment even if Thomas or another woman had not been present. Viewing the record in the light most favorable to Thomas, however, we also conclude that a reasonable trier of fact could find that Thomas was subjected to severe harassment because of her gender.

First, the record will support a finding that Howard did not behave in the same manner towards Thomas as towards DeStefano. The "hot dog" comment can be viewed as only one incident in a pattern of conduct that focused his presentation on Thomas. There is evidence, for example, that Howard stood directly in front of, and

in close proximity to, Thomas when he repeatedly groped his genitals, at times while providing inappropriate, sex-based commentary. There is also evidence that Howard sat in front of Thomas with the tape recorder while fast-forwarding to the sexually explicit portions of the "training tape" and while laughing and providing offensive commentary. Based on this evidence, a trier of fact could infer that the hostile environment experienced by Thomas would not have existed if she had been a man.

■ More importantly, even if Howard had treated Thomas and DeStefano alike, it would not necessarily follow that no sex discrimination occurred. Based upon the rationale of *Lehmann*, we would expect the Supreme Court of New Jersey to hold that a sex-oriented employment environment that has a disparate impact on reasonable women violates the LAD. *Lehmann*, 626 A.2d at 454 (acknowledging that intent to discriminate is not necessary and that there is a distinction between an environment that a reasonable man would consider hostile and one that a reasonable woman would consider hostile). It would be permissible, we believe, for a trier of fact to conclude that the environment created by Howard was "qualitatively different" for a woman than for a man. *See Cline v. General Elec. Capital Auto Lease, Inc.,* 757 F.Supp. 923, 932 (N.D.Ill.1991) (*prima facie* Title VII case established where, *inter alia,* plaintiff showed that "the harsh treatment she received was qualitatively different from the treatment received by the men in her department"). First, there were portions of Howard's presentation that were disparaging of women, including "dumb blonde" jokes, the use of the word "bitch" as a synonym for "problem," [6] and references to women as

6. Use of the term "bitch" may or may not be

a derogatory term indicative of sex-based hos-

"pussies." But that was not all. Coming in the context of a male instructor having control over the fate of a female student, a jury could easily find that a reasonable woman in Thomas's position would be intimidated, in a way not experienced by a male, by an audio tape presentation saturated with explicit descriptions of sexual activity and having nothing to do with the subject matter of the class. According to Thomas, it was not simply a matter of Howard being crude; she regarded his manner of conducting the class as "especially offensive to women." Appellant's App. at 47. If a jury agreed that this perception of Thomas's was a reasonable one for a woman in her position, it could find that she was a victim of sexual harassment even though DeStefano was exposed to the same conduct. As the Court of Appeals for the Seventh Circuit has observed, it "blinks reality to claim that sexual conduct which demeans women by a man in a position of power, even if not directed at a specific woman victim, equally impacts male and female subordinates. This disparate effect is the discriminatory element in a hostile environment." *Hutchison v. Amateur Electronic Supply, Inc.*, 42 F.3d 1037, 1043 (7th Cir.1994) (footnote omitted).

Because we conclude that there is a material dispute of fact that precludes summary judgment on all but one of Thomas's LAD sexual harassment claims,

we will remand this case to the District Court for further proceedings consistent with this opinion.

■ We will decline Hammonton's invitation to affirm the summary judgment in its favor on the alternative ground that the record will not support a conclusion that it "aided" and "abetted" Howard's sexual harassment in violation of N.J. Stat. Ann. § 10:5–12(e). We do not reach that issue because it is not clear to us that this is the only theory under which Hammonton could be held liable for Howard's conduct.

Hammonton was Thomas's employer. Section 10:5–12(a) of the LAD makes it unlawful "[f]or an employer, because of the ... sex ... of any individual, ... to discriminate against such individual in ... conditions or privileges of employment. ..." *Id. Lehmann* makes clear that "employer liability for supervisory hostile work environment sexual harassment shall be governed by agency principles." *Lehmann*, 626 A.2d at 461; *see also Cardenas v. Massey*, 269 F.3d 251, 267 (3d Cir.2001) ("Under New Jersey's LAD, employers are liable under traditional agency principles."). Hammonton has not briefed the issue of its potential liability on an agency theory under § 10:5–12(a), and we decline to address that issue. Suffice it to say, it is not obvious to us that a record cannot be developed that would support agency liability under that section.

tility, but given the other evidence in this case of sexual and sexist conduct, a jury could interpret the instructor's use of "bitch" as one piece of evidence among many suggesting hostile work environment sexual harassment. *See, e.g., Costa v. Desert Palace, Inc.*, 299 F.3d 838, 861–62 (9th Cir.2002) (en banc) ("Whether this term [bitch] is part of the everyday give-and-take of a warehouse environment or is inherently offensive is not for us to say. Instead, we simply conclude that the jury could interpret it here to be one piece of evidence among many, a derogatory term

indicating sex-based hostility."), *judgment aff'd*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003); *Bailey v. Henderson*, 94 F.Supp.2d 68, 75 (D.D.C.2000) ("'Bitch,' which means 'a female canine' or 'a malicious, spiteful and domineering woman' clearly and objectively has gender-specific connotations. It breaks no new legal ground to state–as the Seventh Circuit acknowledges– that the use of the word 'bitch' can create a hostile work environment; whether it does or not depends on the particular circumstances of the case.")

Moreover, in addition to requiring that employers be liable for sexual harassment on an agency law basis under the LAD, *Lehmann* speaks of "direct liability" for an employer "[w]hen an employer knows or should know of the harassment and fails to take effective measures to stop it" as "the employer has joined with the harasser in making the working environment hostile. The employer, by failing to take action, sends the harassed employee the message that the harassment is acceptable and that the management supports the harasser." *Lehmann*, 626 A.2d at 464. Thomas has tendered evidence tending to show (1) that she notified her superiors of the situation she faced and of her concern that she needed to pass the 911 class in order not to lose her employment, and (2) that none of her superiors assured her that she could avoid that hostile environment without putting her job in jeopardy. While that evidence clearly does not compel a conclusion that Hammonton is directly liable for condoning Howard's conduct, it is enough to create a material dispute of fact.

■ Diane DeCicco is nonetheless entitled to summary judgment on the hostile work environment sexual harassment claim. This Court has predicted that New Jersey will not impose liability on individual supervisors as "employers" under N.J. Stat. Ann. § 10:5–5(a). *See Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 125 (3d Cir.1999). We have also predicted that in order to aid and abet a violation of the LAD under N.J. Stat. Ann. § 10:5–12(e), an individual must "knowingly give[ ] substantial assistance or encouragement to the unlawful conduct of his employer." *Failla v. City of Passaic*, 146 F.3d 149, 158 (3d Cir.1998). The record is clear that DeCicco provided no assistance with respect to any of the alleged hostile work environment sexual harassment. The conduct of DeCicco at issue in this lawsuit related solely to Thomas's retaliation claims. Therefore, we will affirm the District Court's grant of summary judgment to DeCicco on the hostile work environment sexual harassment claim.

Because Thomas and Howard were not employed by the same employer, this case presents substantial, state law liability issues that have not been directly addressed by the Supreme Court of New Jersey. For that reason, the District Court may wish to consider whether it should continue to exercise its supplemental jurisdiction now that all of the federal claims have been resolved. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). We leave that matter to the sound discretion of the District Court and mention it here only to make clear that our remand with instructions to conduct further proceedings will not foreclose the District Court from declining to exercise its supplemental jurisdiction over Thomas's remaining state law claim.

## V. *Conclusion*

The judgments of the District Court on Thomas's federal claims and her state retaliation claims will be affirmed, as will the judgment in favor of Diane DeCicco on Thomas's LAD sexual harassment claim. However, we will reverse the judgments in favor of the other defendants on Thomas's LAD sexual harassment claims and remand for further proceedings.