902 A.2d 327 (2006)
386 N.J. Super. 582
Theresa THOMAS, Plaintiff-Appellant,
v.
COUNTY OF CAMDEN, Camden County Communications Center, and Michael Howard, Defendants-Respondents. and
Town of Hammonton, and Mayor and Council of the Town of Hammonton, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued May 30, 2006.
Decided July 21, 2006.
*330 Mark Cimino, argued the cause for appellant.
Lawrence M. Vecchio, Assistant County Counsel, argued the cause for respondent (Office of Camden County Counsel, attorneys; Mr. Vecchio, on the brief).
Before Judges CUFF, PARRILLO and GILROY.
The opinion of the court was delivered by
PARRILLO, J.A.D.
Plaintiff, Theresa Thomas, appeals from a summary judgment order dismissing her sexual harassment action against the County of Camden, its employee Michael Howard, and the Camden County Communications Center (CCCC) (collectively, the Camden defendants), brought under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49. We are asked to decide two issues in this appeal: (1) whether the CCCC is a "place of public accommodation" for purposes of determining whether the Camden defendants discriminated against plaintiff in the furnishing thereof, N.J.S.A. 10:5-1f(1); and (2) whether there was an employer-employee relationship between plaintiff and the Camden defendants for purposes of determining whether employment discrimination occurred, N.J.S.A. 10:5-12(a).
In our review of the record, we view the evidence, as we must, in a light most favorable to plaintiff. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). In March 2000, the Town of Hammonton hired plaintiff as a radio dispatcher for its police department. She commenced employment on April 2, 2000, and was terminated on June 29, 2000. Shortly after she began working, Hammonton required plaintiff to obtain a 9-1-1 certification. N.J.A.C. 17:24-2.2(c). Consequently, plaintiff enrolled in the Association of Public-Safety Communications Officials International (APCO) basic telecommunicator training program run by Camden County and taught by Howard at the CCCC. She attended class on June 5, 6 and 7, 2000, and appeared for approximately five minutes on June 8, 2000. During the course of instruction, plaintiff claims Howard sexually harassed her by subjecting her to "various lewd and derogatory remarks of a sexual nature", and to a tape recording of supposed emergency calls consisting of obscene material. When plaintiff complained of Howard's conduct to her superior officers at the Hammonton Police Department, she was advised that she did not have to return to the class. Instead, the police chief made alternate arrangements for plaintiff to take the dispatcher certification test, which she passed. On June 9, 2000, plaintiff received a certificate of completion of the requirements of the APCO basic telecommunicator training program. Plaintiff, however, did not report to work after June 14, 2000, claiming to be sick. As a *331 result, Hammonton terminated her employment on June 29, 2000.
Plaintiff, thereafter, filed a complaint in federal court against Hammonton, its governing body and clerk, and the Camden defendants, alleging violations of the Due Process Clause, the First Amendment, the Consolidated Omnibus Budget Reconciliation Act, the New Jersey LAD, and the New Jersey Conscientious Employee Protection Act. The district court granted summary judgment in favor of all defendants, but the appeals court reversed as to the LAD claims. Thomas v. Town of Hammonton, 351 F.3d 108, 119 (3d Cir. 2003). On remand, the district court dismissed plaintiff's complaint pursuant to 28 U.S.C. § 1367(d).
This sexual harassment action in the Law Division followed dismissal of plaintiff's federal lawsuit. On the Camden defendants' motion for summary judgment, plaintiff posited two functionally distinct theories of liability under the LAD: employment discrimination and discrimination in relation to public accommodation. In granting the Camden defendants summary judgment dismissing plaintiff's complaint,[1] the motion judge rejected both theories, finding that the CCCC was not a place of public accommodation and that no employment relationship existed between plaintiff and the Camden defendants for purposes of coming within the purview of the LAD's discrimination ban. Plaintiff appeals. We affirm as to the latter determination, but reverse as to the former because we conclude that the Camden defendants qualify as a "place of public accommodation" to support an LAD claim.

(i)
Without question, sexual harassment is "a form of targeted discrimination." Pukowsky v. Caruso, 312 N.J.Super. 171, 177, 711 A.2d 398 (App.Div.1998). Equally without doubt, the LAD proscribes sexual harassment both in the workplace, Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 600-01, 626 A.2d 445 (1993), and in places of public accommodation, N.J.S.A. 10:5-4. Thus,
All persons shall have the opportunity to obtain employment, and to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation ... without discrimination because of ... sex ... subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right.
[N.J.S.A. 10:5-4.]
Further, N.J.S.A. 10:5-12 provides that "[i]t shall be . . . unlawful discrimination":
For any . . . agent, or employee of any place of public accommodation directly or indirectly to refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof, or to discriminate against any person in the furnishing thereof ... on account of the [person's] ... sex ....
[N.J.S.A. 10:5-12f(1).]
Significantly, "[t]he prohibition of discrimination in relation to public accommodation is functionally distinct from the ban on employment discrimination." Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 67, 389 A.2d 465 (1978).
N.J.S.A. 10:5-5l provides a non-exhaustive list of places of "public accommodations." In other words, places of public accommodation are not limited to those set forth in the statute. Our "statutory definition of `[a] place of public accommodation' is extremely broad", and "[t]he term is said to `include, but not be limited *332 to,' a list of over 50 types of places." Boy Scouts of Am. v. Dale (Dale I), 530 U.S. 640, 656-57, 120 S.Ct. 2446, 2455, 147 L.Ed.2d 554, 568 (2000) (quoting N.J.S.A. 10:5-5(l) (first alteration in original)); Zahorian v. Russell Fitt Real Estate Agency, 62 N.J. 399, 412, 301 A.2d 754 (1973); Fraser v. Robin Dee Day Camp, 44 N.J. 480, 486, 210 A.2d 208 (1965). "Many on the list are what one would expect to be places where the public is invited." Dale I, supra, 530 U.S. at 657, 120 S.Ct. at 2455, 147 L.Ed.2d at 568. "But the statute also includes places that often may not carry with them open invitations to the public...." Ibid. This is so "because the goal of the NJLAD is to eradicate the `cancer of discrimination,' the statute must be broadly interpreted to further its purposes." Ellison v. Creative Learning Ctr., 383 N.J.Super. 581, 588, 893 A.2d 12 (App. Div.2006) (quoting Dale v. Boy Scouts of Am. (Dale II), 160 N.J. 562, 584-85, 734 A.2d 1196 (1999), rev'd and remanded on other gr., 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000)).
Generally, in the context of private entities, from commercial to membership organizations providing services to the public, we have developed standards to help determine whether the entity qualifies as a public accommodation. In this regard, our "focus appropriately rests on whether the entity `engages in broad public solicitation, whether it maintains close relationships with the government or other public accommodations, or whether it is similar to enumerated or other previously recognized public accommodations.'" Id. at 588-89, 893 A.2d 12 (quoting Dale II, supra, 160 N.J. at 588, 734 A.2d 1196); Ptaszynski v. Uwaneme, 371 N.J.Super. 333, 346, 853 A.2d 288 (App.Div.), certif. denied, 182 N.J. 147, 862 A.2d 56 (2004). For non-public entities, "[t]he existence of broad public solicitation has `consistently been a principal characteristic of public accommodations.'" Ellison, supra, 383 N.J.Super. at 589, 893 A.2d 12 (quoting Dale II, supra, 160 N.J. at 588, 734 A.2d 1196). Compare Frank v. Ivy Club, 120 N.J. 73, 104-05, 576 A.2d 241 (1990) (eating club at Princeton University was a place of public accommodation), cert. denied sub nom., Tiger Inn v. Frank, 498 U.S. 1073, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991); Clover Hill Swimming Club, Inc. v. Goldsboro, 47 N.J. 25, 33, 219 A.2d 161 (1966) (an incorporated swimming club was a place of public accommodation); Nat'l Org. for Women, Essex County Chapter v. Little League Baseball, Inc. 127 N.J.Super. 522, 531, 318 A.2d 33 (App.Div.) (the Little League was a place of public accommodation), aff'd, 67 N.J. 320, 338 A.2d 198 (1974) with Wazeerud-Din v. Goodwill Home & Missions, Inc., 325 N.J.Super. 3, 9, 737 A.2d 683 (App.Div.1999) (religious drug rehabilitation program was not a place of public accommodation), certif. denied, 163 N.J. 13, 746 A.2d 458 (2000); Blair v. Mayor & Council, Borough of Freehold, 117 N.J.Super. 415, 417, 285 A.2d 46 (App.Div.1971) (volunteer fire department was not place of public accommodation because it was maintained for member use, not general public use), certif. denied, 60 N.J. 194, 287 A.2d 454 (1972).
Here, of course, we are not required to analyze the extent of public solicitation or the closeness of the relationship with government simply because the Camden defendants are public entities and, by their very nature, constitute a place of public accommodation. See Ptaszynski, supra, 371 N.J.Super. at 346-47, 853 A.2d 288 (township and municipal police stations are places of public accommodation); see also Hinfey v. Matawan Reg'l Bd. of Educ., 77 N.J. 514, 523, 391 A.2d 899 (1978) ("Public schools and public education" as places of public accommodation, *333 "assuredly are covered by the anti-discrimination law."). But see Doe v. Div. of Youth & Family Servs., 148 F.Supp.2d 462, 496 (D.N.J.2001) (state agency DYFS was not place of public accommodation because not included on the list of public accommodations and it does not engage in broad public solicitation).
Undisputably, the County of Camden is a creature of state government, N.J.S.A. 2A:44-126, and the CCCC is a division of the Department of Public Safety, an executive unit of county government. As the uncontradicted proof demonstrates, the CCCC is a dispatch agency for police, fire and emergency medical services. It handles fire and ambulance dispatching and a majority of police dispatching for Camden County municipalities and all 9-1-1 services. It is a "public safety answering point." N.J.S.A. 52:17C-7. It also functions as the training center for county personnel employed at the CCCC and for police departments that do not have a facility to teach the APCO program.
A unit of county government performing an executive function of county government, N.J.S.A. 2A:44-126, the CCCC is not a "private entity that needs to be shoe-horned into a list of other, primarily private, entities that provide services to the public." Ptaszynski, supra, 371 N.J.Super. at 347, 853 A.2d 288. As we noted in that case:
It would indeed lead to an anomalous result if private organizations with close ties to government agencies were places of public accommodation because of those ties, while the government agency itself was not.
[Ibid.]
Despite their obvious public character, defendants nevertheless argue they are not a place of public accommodation because public access to the CCCC building, which is "locked down 24 hours per day, 7 days per week," is limited and tightly controlled. In granting them summary judgment, the motion judge agreed, concluding:
And the bottom line is this. I find that the Camden County Communications Center is not an area of public accommodation. It is a governmental agency, but in my judgment, that's not dispositive of the issue. And ... it is a secured facility by invitation only, with a special mission, so to speak, that does not provide general services to the public back and forth. It provides obviously a public service. It's the Communications Center. But so does the governor's office; he provides a public service. Runs the State from the executive standpoint. And it seems to me that if the governor's officeand when I say the governor's office, I'm not talking about the hallway outside the governor's officeI'm talking about the governor's office, a place where he opens up the door. He sees his office, he sees his desk, the seat, that that is not, that specific area is not an area of public accommodation, then even though the Camden County Communications Center is perhaps not as strong in terms of the argument, it is more akin to the governor's inner office, so to speak, that is, the police department or restaurant, bathroom, that type of thing. And since I don't believe that the LAD controls the liability of Camden County as to what occurred at the dispatcher department,
....
This reasoning, however, overlooks the plain fact that "`places do not discriminate; people who own and operate places do.'" Dale v. Boy Scouts of Am. (Dale III), 308 N.J.Super. 516, 533, 706 A.2d 270 (App.Div.1998) (quoting Welsh v. Boy Scouts of Am., 993 F.2d 1267, 1282 (7th Cir.) (Cummings, J., dissenting), cert. *334 denied, 510 U.S. 1012, 114 S.Ct. 602, 126 L.Ed.2d 567 (1993)), aff'd, 160 N.J. 562, 734 A.2d 1196 (1999), rev'd & remanded on other grounds, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000). If the County of Camden and its executive units are not subject to the LAD, its employees would be free to discriminate, a prospect we simply could not tolerate. As we noted in a closely analogous context, "[t]o countenance discrimination by a police force, while seeking to eradicate discrimination, for instance, in private organizations, public libraries and universities, would be both inconsistent with and contrary to the goals of the LAD." Ptaszynski, supra, 371 N.J.Super. at 348, 853 A.2d 288. Clearly, then, "any State governmental agency is a place of public accommodation for purposes of inclusion under the umbrella of the LAD ...." Ibid. As the Court noted in Dale II, "New Jersey governmental entities are, of course, bound by the LAD." Dale II, supra, 160 N.J. at 593 n. 7, 734 A.2d 1196. It was error, therefore, for the motion judge to have dismissed plaintiff's LAD claim on the grounds that the CCCC was not a place of public accommodation.

(ii)
On the other hand, we are satisfied that the judge's dismissal of that part of plaintiff's cause of action alleging a claim of employment discrimination was proper. This is because there was no legally recognizable employment relationship between plaintiff and defendants.
Clearly, "the LAD was intended to prohibit discrimination in the context of an employer/employee relationship ...." Pukowsky, supra, 312 N.J.Super. at 184, 711 A.2d 398; see also Delgado v. McTighe, 442 F.Supp. 725, 729 (E.D.Pa. 1977) ("[T]he courts have determined that there must be either an employer-employee relationship between the parties or a prospective one".). Correspondingly, the lack of an employment relationship between the plaintiff and the defendant will preclude liability. Cf. Ass'n of Mexican-American Educators v. California, 231 F.3d 572, 582 (9th Cir.2000); United States v. Bd. of Educ. for Sch. Dist., 911 F.2d 882, 891 (3d Cir.1990); Tyrrell v. City of Scranton, 134 F.Supp.2d 373, 380 (M.D.Pa.2001).
The LAD's definition of the terms "employee" and "employer" is admittedly broad. D'Annunzio v. Prudential Ins. Co. of Am., 383 N.J.Super. 270, 277, 891 A.2d 673 (App.Div.2006), certif. granted, 186 N.J. 608, 897 A.2d 1062 (2006). In defining "[e]mployee", the LAD states only that the term "does not include any individual employed in the domestic service of any person." N.J.S.A. 10:5-5f. The term "[e]mployer" is similarly inclusive, encompassing any person, "unless otherwise specifically exempt under another section of this act, and includes the State, any political or civil subdivision thereof, and all public officers, agencies, boards or bodies." N.J.S.A. 10:5-5e. A "[p]erson" is "one or more individuals, partnerships, associations, organizations, labor organizations, corporations, legal representatives, trustees, trustees in bankruptcy, receivers, and fiduciaries." N.J.S.A. 10:5-5a.
Because of the breadth of the statutory language, courts in New Jersey have developed "a twelve-factor test in the context of a LAD claim to determine whether an employment relationship exists between the parties." Kounelis v. Sherrer, 396 F.Supp.2d 525, 532 (D.N.J.2005). In the absence of a strict or direct employer-employee relationship, and consistent with the principles of agency law, Minerva Marine, Inc. v. Spiliotes, No. 02-2517, 2006 U.S. Dist. Lexis 13922, at *35 (D.N.J. Mar. 13, 2006); see Kurdyla v. Pinkerton Sec., 197 F.R.D. 128, 134 n. 15 (D.N.J. 2000), we examine the following factors *335 when determining whether a worker is an employee under N.J.S.A. 10:5-5f:
"(1) the employer's right to control the means and manner of the worker's performance; (2) the kind of occupation-supervised or unsupervised; (3) skill; (4) who furnishes the equipment and workplace; (5) the length of time in which the individual has worked; (6) the method of payment; (7) the manner of termination of the work relationship; (8) whether there is annual leave; (9) whether the work is an integral part of the business of the `employer;' (10) whether the worker accrues retirement benefits; (11) whether the `employer' pays social security taxes; and (12) the intention of the parties."
[D'Annunzio, supra, 383 N.J.Super. at 279, 891 A.2d 673 (quoting Pukowsky, supra, 312 N.J.Super. at 182-83, 711 A.2d 398).]
"`The most important of these factors is the first, the employer's right to control the means and manner of the worker's performance.'" Chrisanthis v. County of Atl., 361 N.J.Super. 448, 455, 825 A.2d 1192 (App.Div.) (quoting Franz v. Raymond Eisenhardt & Sons, Inc., 732 F.Supp. 521, 528 (D.N.J.1990)), certif. denied, 178 N.J. 31, 834 A.2d 404 (2003); Perlowski v. Elson T. Killam Assocs., Inc., 384 N.J.Super. 467, 474, 894 A.2d 1251 (Law Div.2005).
As noted, the Pukowsky test is used to determine who is an employer in cases lacking an actual or customary employer-employee relationship, such as in instances of dual employment, see e.g., Chrisanthis, supra, 361 N.J.Super. at 454, 456, 825 A.2d 1192, or to ascertain whether the worker is really functioning as an independent contractor. See e.g., Pukowsky, supra, 312 N.J.Super. at 180, 711 A.2d 398. In analogous situations arising under federal anti-discrimination laws, the Third Circuit Court of Appeals has adopted a de facto test that measures the extent of the employer's control over the employee. Graves v. Lowery, 117 F.3d 723, 729-30 (3d Cir.1997); see also United States v. Bd. of Educ. for the Sch. Dist. of Philadelphia, 911 F.2d 882, 891 (3d Cir.1990). "For claims of hostile work environment brought under Title VII [of the Civil Rights Act of 1964, 42 U.S.C.A. §§ 2000e to 2000-17], the Third Circuit applies a `control test' to determine whether an entity is an `employer'." Russo v. Ryerson, No. 01-CV-4458, 2006 WL 477006, at *4, 2006 U.S. Dist. Lexis 10447, at *15 (D.N.J. Feb. 28, 2006) (citing Graves, supra, 117 F.3d at 723.[2]) Other circuits have followed suit. Ass'n of Mexican-American Educators, supra, 231 F.3d at 582-83; Mangram v. General Motors, 108 F.3d 61, 62-63 (4th Cir.1997); E.E.O.C. v. Illinois, 69 F.3d 167, 169 (7th Cir.1995).
The control test as it relates to a de facto employer "is appropriately used where it is clear that a putative defendant does not directly employ the plaintiff, but nevertheless controls the plaintiff's employment to the point that it would contravene the intent of Title VII for the putative defendant to avoid liability for its own discriminatory actions." Kerr v. WGN Cont'l Broad. Co., 229 F.Supp.2d 880, 886 (N.D.Ill.2002); see e.g., Conroy v. City of Phila., 421 F.Supp.2d 879 (E.D.Pa.2006) (explaining how "City's ability to place its own requirements upon the hiring process," as well as "its control over the rate of hiring, and its authority vis a vis firings," *336 indicates that the State did not have an indirect or de facto employment relationship with plaintiff and the claims should be dismissed); Tyrrell, supra, 134 F.Supp.2d at 380 (explaining how firefighter plaintiff was hired by city, required to complete training at academy, failed to satisfy physical training requirements, was terminated, and could not bring age discrimination claim against academy because it did not have such control over plaintiff's work life to be considered de facto employer).
Indirect liability results when the defendant employer "so far control[s] the plaintiff's employment relationship that it [is] appropriate to regard the defendant as the de facto or indirect employer of the plaintiff...." E.E.O.C., supra, 69 F.3d at 169. In other words, "[d]e facto or indirect employer liability depends on the amount of the control a putative Title VII defendant exerts over the plaintiff's employment." Kerr, supra, 229 F.Supp.2d at 886. It "addresses the situation where a formal employment relationship may be absent, but the putative defendant is so extensively involved with the plaintiff's day to day employment that the putative defendant is the `real' employer for all intents and purposes, including Title VII liability." Ibid.; see E.E.O.C., supra, 69 F.3d at 171 (explaining how entities that "pull[ ] the strings in the background", and retain employment decision making power, are de facto employers pursuant to Title VII).
The circumstances in the Tyrrell case bear striking similarity to those here. Tyrrell, a newly hired firefighter, was required to complete training at a community college fire academy pursuant to a collective bargaining agreement struck between the firefighters' union and the city. Tyrrell, supra, 134 F.Supp.2d at 375. He could not complete the training on his first attempt due to injury, and when given another opportunity, he was unable to satisfy the physical training requirements imposed by the academy. Id. at 376. Subsequently terminated, Tyrrell filed an age discrimination action against the city, the firefighters' union, and the community college that provided the physical training program, alleging that defendants sought to exclude otherwise qualified older persons from city firefighter positions by subjecting them to rigorous physical requirements that were not bona fide occupational qualifications. Id. at 375. The court, adopting the de facto test, held that Tyrrell did not advance a successful Title VII claim against the academy because, as a community college, it did "not have such control over the plaintiff student's work life that it could be considered his de facto employer." Id. at 380.
Despite the soundness of the de facto test, plaintiff nevertheless advances a more expansive "aiding and abetting" theory of liability espoused in Sibley Mem'l Hosp. v. Wilson, 488 F.2d 1338 (D.C.Cir.1973), to encompass any putative defendant who adversely affects a plaintiff's employment with a third party. Id. at 1340-42. In other words, plaintiff argues that under the LAD, liability exists, even in the absence of a direct employment relationship between the plaintiff and defendant, when a defendant interferes with or intrudes upon plaintiff's employment opportunities with a third party by unlawfully discriminating against the plaintiff. See Morrison v. Amer. Bd. of Psychiatry and Neurology, Inc., 908 F.Supp. 582 (N.D.Ill.1996).
In Sibley, the court held that a male private duty nurse, who was paid directly by his patients, had a right of action for sex discrimination cognizable under Title VII although defendant hospital was not his "employer." Sibley Mem'l Hosp., supra, *337 488 F.2d at 1340-42. In so holding, the court found that the hospital, which operated a registry and referral program that supposedly refused to refer the plaintiff to female patients, had a sufficient nexus to the creation and continuance of the nurse's direct employment to bring the hospital under the reach of Title VII. Id. at 1342. The court reasoned:
Control over access to the job market may reside, depending upon the circumstances of the case, in a labor organization, an employment agency, or an employer as defined in Title VII; and it would appear that Congress has determined to prohibit each of these from exerting any power it may have to foreclose, on indivious grounds, access by any individual to employment opportunities otherwise available to him. To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited.
[Id. at 1341.]
We are persuaded that the LAD's reach, broad as it is, does not extend to those whose only nexus, employment-wise, is to adversely affect an aggrieved person's employment with a third party. Rather, we find the Third Circuit's de facto employer test the more reasonable measure of liability, compatible as it is with Pukowsky's emphasis on the degree of control the putative employer exercises over the worker.
Regardless of which test is applied, we are satisfied that based on the undisputed facts in this case, the relationship between plaintiff and the Camden defendants does not amount to employment for purposes of the LAD. Most significantly, the Camden defendants exerted none of the indicia of control over plaintiff traditionally associated with the employer-employee relationship. For instance, while plaintiff was enrolled in the training program, the Camden defendants did not compensate her, pay social security taxes for her, or provide health benefits to her. Nor did plaintiff accrue retirement or vacation benefits from the Camden defendants. Notably, the Camden defendants did not have the right to dictate the terms, conditions or privileges of her employment as a radio dispatcher with the Town of Hammonton. Moreover, for Sibley purposes, although the Town of Hammonton, plaintiff's actual employer, required her to obtain a 9-1-1 certification, she could have obtained the credential other than at the CCCC. Moreover, "[a]ttendance at the training program was not mandatory" and plaintiff was "free to leave the classroom as [she] pleased." Indeed, plaintiff received her certification despite her noncompletion of classroom training. Thus, it cannot be said that the Camden defendants controlled whether or not plaintiff could obtain the APCO certification, much less interfered with her future third-party employment opportunities. And unlike Sibley, this is not a case where plaintiff's actual employer, the Township of Hammonton, entrusted a third partythe Camden defendantswith the responsibility to screen and supervise its employees, or control their work life. As such, plaintiff fails to satisfy even Sibley's more expansive view of employment to establish her sexual harassment employment discrimination claim under the LAD.
Accordingly, we affirm the portion of the order of the motion judge that dismissed plaintiff's LAD employment discrimination claim. We reverse, however, the remainder *338 of the order that dismissed plaintiff's LAD claim on the grounds that the Camden defendants were not a place of accommodation, and remand for further proceedings consistent with this opinion.
Affirmed in part; reversed and remanded in part.
NOTES
[1] The Hammonton defendants eventually settled with plaintiff.
[2] Our state policy is to look to Title VII for guidance when interpreting provisions of the New Jersey LAD and to federal precedent governing Title VII "'as a key source of interpretative authority.'" Pukowsky, supra, 312 N.J.Super. at 178, 711 A.2d 398 (quoting Lehmann, supra, 132 N.J. at 600-01, 626 A.2d 445).