893 A.2d 12 (2006)
383 N.J. Super. 581
Diane A. ELLISON, Individually and as Guardian Ad Litem for Luke Whittle, Plaintiff-Appellant,
v.
CREATIVE LEARNING CENTER and Bonnie Pauska, Defendants-Respondents/Cross-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued November 29, 2005.
Decided March 8, 2006.
*13 Joel N. Kreizman, Ocean, argued the cause for appellant (Evans, Osborne and Kreizman attorneys; Mr. Kreizman on the brief).
Robert A. Morley argued the cause for respondents/cross-appellants (Stephen E. Gertler, Wall Township, attorney; Mr. Morley on the brief).
Before Judges AXELRAD, PAYNE and MINIMAN.
The opinion of the court was delivered by
PAYNE, J.A.D.
Plaintiff Dianne Ellison appeals on her own behalf and on behalf of her minor son, Luke, from an order of summary judgment dismissing their claim of discrimination *14 on the basis of disability filed pursuant to the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. 10:5-1 to -45, against defendants the Creative Learning Center (CLC) and its owner, Bonnie Pauska. Plaintiffs' claim arises out of the CLC's alleged decision to exclude Luke from its pre-school program because he utilized an insulin pump as a means of administering treatment for his juvenile diabetes. The CLC and Pauska have cross-appealed from the court's determination that the CLC is a place of public accommodation under N.J.S.A. 10:5-5(1) and that plaintiffs' cause of action was not preempted by the federal Individuals with Disabilities Education Act (IDEA), 20 U.S.C.A. §§ 1400 to 1482. We affirm in part and reverse in part.
Luke was born on November 18, 1997, and was diagnosed with Type I (juvenile) diabetes in February 1999. Until July 2002, Luke was administered insulin for the treatment of his condition through hypodermic syringes. In July, Luke was fitted with an insulin pump that delivered a gradual infusion of insulin through a tube implanted under his skin.
During the 2001-2002 school year, Luke had attended St. John's Nursery School, where the teaching staff performed the blood tests required to monitor Luke's glucose levels. In January 2002, Ellison sought admission for Luke at the CLC, where, after an interview and observation, he was accepted for the term commencing in September 2002. It was anticipated that Luke would attend school from 9:00 a.m. to 11:45 a.m. four days a week. The fact that Luke was a diabetic was disclosed at the time of the initial interview, and Ellison demonstrated then how to perform a blood glucose test. Luke was the school's first diabetic student.
In August 2002, Ellison informed Pauska that Luke had been fitted with an insulin pump, and she sought a meeting to explain its use to the school's teachers. The meeting was scheduled for September 5, after the teachers returned from their summer break. On that date, Ellison met with two teachers to explain the pump's operation. She told them, among other things, that if Luke were given a snack or other food at school, he could need an additional boost or bolus of insulin that would be administered through the pump. In order to calculate the amount of the bolus, the teachers would need to estimate the amount of carbohydrates that Luke had eaten and program the pump accordingly. Ellison also testified in her deposition that she "explained to them the importance of balancing insulin and food, and [that] too much insulin whether it's given by needle ... or pump without the balance of food ... can have fatal effects." Ellison testified additionally that she had offered to come to school to train the teachers on the proper use of the pump.
According to Ellison, on the day that the meeting had occurred, she was called by Pauska who, after a preliminary conversation in which she asked Ellison to personally monitor Luke's care at school throughout the year, withdrew Luke's acceptance. Pauska has denied doing so, and claims that Ellison withdrew Luke from the school in a fax received on September 6. Pauska has claimed additionally that on September 5, after the meeting between Ellison and the teachers, she called the State and was referred to the Child Care Health Consultant Coordinator for Monmouth County, Patricia Luccarelli, who informed her that any training of school personnel should be done by a medical professional such as Luke's endocrinologist, and that certain authorization forms would have to be executed by Ellison. Luccarelli confirmed the substance of Pauska's statement regarding their communications in deposition testimony, and *15 stated further that she prepared materials for Pauska's use and, with Pauska's agreement, met with her at CLC on the following day to discuss Luke's care. Pauska claims to have called Ellison after speaking to Luccarelli in order to arrange for instruction by Luke's endocrinologist, and to have left a message for her. Ellison denies the call.
Following the September incident, Luke was re-enrolled at St. John's Nursery School, where he remained until entering public school. Fees paid by Ellison to CLC were returned to her at her request, along with a letter dated September 18, 2002 that refers to Luke's condition and the reasons for the termination of his enrollment at the CLC. Suit was filed against the CLC and Pauska on June 9, 2003.
After the period for discovery had ended, the CLC and Pauska moved for summary judgment. In granting that motion, the judge found that the CLC was a place of public accommodation to which the NJLAD applied, and that the NJLAD was not preempted in this case by the federal IDEA. However, the judge found no obligation on the CLC's part to provide reasonable accommodations for Luke's care, and thus granted summary judgment in defendants' favor. Plaintiffs' appeal and defendants' cross-appeal followed.

I.
We affirm the trial court's determination that the CLC, a profit-making entity offering to the public progressive educational programs for children from the age of three through the first grade, was a place of public accommodation subject to the antidiscrimination provisions of the NJLAD. N.J.S.A. 10:5-12f(1) (prohibiting discrimination in places of public accommodation). The statute's definitional section, N.J.S.A. 10:5-5(l), provides that a place of public accommodation
shall include, but not be limited to: ... any kindergarten, primary and secondary school, trade or business school, high school, academy, college and university, or any educational institution under the supervision of the State Board of Education, or the Commissioner of Education of the State of New Jersey. Nothing herein contained shall be construed to include or to apply to any institution, bona fide club, or place of accommodation, which is in its nature distinctly private; ... nor shall anything herein contained be construed to bar any private secondary or post secondary school from using in good faith criteria other than race, creed, color, national origin, ancestry or affectional or sexual orientation in the admission of students.
The CLC argues that it is not a place of public accommodation because it is a "distinctly private" entity that offers services of an "exclusive nature" to candidates selected through a vetting process that ensures the exclusion of children "who would not benefit from the highly active, non-traditional, open classroom learning environment." It also claims exclusion from the definition of a public accommodation because it operates as a day care center overseen by the Department of Human Services, pursuant to N.J.S.A. 30:5B-4, not the Department of Education, and it asserts that it does not provide the educational services offered by institutions regulated by the Department of Education.
Claims of exemption from the NJLAD on the basis of the private character of the entity "require close scrutiny by... the courts," Frank v. Ivy Club, 120 N.J. 73, 102, 576 A.2d 241 (1990), cert. denied, 498 U.S. 1073, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991), so that "[no] device *16 whether innocent or subtly purposeful can be permitted to frustrate the legislative determination to prevent discrimination." Ibid. (quoting Clover Hill Swimming Club v. Goldsboro, 47 N.J. 25, 34, 219 A.2d 161 (1966)) (quoting Jones v. Haridor Realty Corp., 37 N.J. 384, 396, 181 A.2d 481 (1962)). In this regard, "[t]he elimination of discrimination in educational institutions is particularly critical." Id. at 110-11, 576 A.2d 241.
The motion judge found that, despite the fact that the school was supervised by the Department of Human Services, it was a place of public accommodation because it engaged in broad public solicitation for students through an advertisement in the Yellow Pages and filled an essential role in providing pre-school education that was not offered by public schools. The judge found the school did not fit within the exemption for private institutions, because it was not a membership organization, it extended its solicitations to the public in general, it was organized for profit, and it was controlled by stockholders, not members. Moreover, the court noted that the school treated itself as a place of public accommodation, since on its enrollment form it held itself out as having an open admission policy and as nondiscriminatory.
We find the court's analysis of this issue to have been correct. As the Supreme Court has recognized, because the goal of the NJLAD is to eradicate the "cancer of discrimination," the statute must be broadly interpreted to further its purposes. Dale v. Boy Scouts of Am., 160 N.J. 562, 584-85, 734 A.2d 1196 (1999), rev'd and remanded on other gr., 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000); see also N.J.S.A. 10:5-3 (declaring that the NJLAD shall be liberally construed). In this context, "[a] clear understanding of the phrase `place of public accommodation' is critical" since it is determinative in large measure of the NJLAD's scope. Dale, supra, 160 N.J. at 585, 734 A.2d 1196.
Precedent has long established that places of public accommodation are not limited to those set forth in the statute. Fraser v. Robin Dee Day Camp, 44 N.J. 480, 486, 210 A.2d 208 (1965). As the Court found there, the statutory definition's use of the word "include" to introduce a listing of examples demonstrates that the list is "merely illustrative of the accommodations the Legislature intended to be within the scope of the statute. Other accommodations, similar in nature to those enumerated, were also intended to be covered." Ibid. The Legislature's intent has been further clarified by the addition of the words "but not be limited to" at the beginning of the enumeration. See L. 1966, c. 17 § 1.
As the motion judge recognized, in determining whether an entity constitutes a place of public accommodation, the focus appropriately rests on whether the entity "engages in broad public solicitation, whether it maintains close relationships with the government or other public accommodations, or whether it is similar to enumerated or other previously recognized public accommodations." Dale, supra, 160 N.J. at 588, 734 A.2d 1196.
The existence of broad public solicitation has "consistently been a principal characteristic of public accommodations." Ibid. The record in this case discloses that the CLC engaged in such solicitation through the placement of at least one widely circulated advertisement for the school. That it is selective in its admissions is of no moment, since an invitation to apply is given to the public at large. Indeed, the statutory definition contained in N.J.S.A. 10:5-5(l) confirms that selectivity in admissions may exist in places of public accommodation, since that definition authorizes the use of selective admissions criteria in connection *17 with secondary and post secondary education, so long as they are non-discriminatory in nature. In Frank, the fact that Princeton University, a selective private school, was a place of public accommodation was considered indisputable. 120 N.J. at 110, 576 A.2d 241.
Moreover, the CLC of necessity maintains close ties to government as the result of its licensing and regulation through the Department of Human Services, see N.J.S.A. 30:5B-1 to -15; N.J.A.C. 10:122-1.1 to -9.9. Further, the record discloses that the enrichment and progressive learning programs that the CLC offers are educational in nature and are closely related in their function to those provided by the kindergartens and primary schools that are specifically identified in the statutory definition of a place of public accommodation. "Public schools and public education" as places of public accommodation, "assuredly are covered by the anti-discrimination law." Hinfey v. Matawan Regional Bd. of Educ., 77 N.J. 514, 523, 391 A.2d 899 (1978). The CLC, which operates as a non-sectarian private school, cannot be meaningfully distinguished in this context. That the CLC is operated for profit, is controlled by shareholders, and engages in public advertising provide further grounds for its inclusion as a place of public accommodation. See Clover Hill Swimming Club, supra, 47 N.J. at 34-35, 219 A.2d 161.
The CLC has none of the indicia of privateness that would warrant its exclusion from the definition of a place of public accommodation. Its origin, admissions criteria and governance bear no resemblance to analogous features that characterize membership organizations, and it does not restrict its student body other than by criteria related to a student's suitability to undertake the program. We thus find no factual dispute sufficient to warrant submission of the issue of the CLC's status to a jury. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). The court's determination of this issue is affirmed.

II.
We also affirm the motion judge's determination that the application of the NJLAD to this case was not explicitly preempted by the federal IDEA, and preemption did not occur as the result of the operation either of the doctrines of field or conflict preemption. See R.F. v. Abbott Labs., 162 N.J. 596, 618-19, 745 A.2d 1174 (2000)(discussing theories of preemption). Because the IDEA is inapplicable to Luke, the issue of preemption does not arise in this case.
The IDEA was enacted by Congress to facilitate "our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities[,]" and it affirms that "[i]mproving educational results for children with disabilities is an essential element" of federal policy. 20 U.S.C.A. § 1400(c)(1). One of the statute's primary purposes is to ensure "that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C.A. 1400(d)(1)(A). A child with a disability is defined by the statute as a child
(i) with mental retardation, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance, ... orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and

*18 (ii) who, by reason thereof, needs special education and related service.
[20 U.S.C.A. § 1401(3).]
The inapplicability of the IDEA to Luke is apparent, since his intellect is in no way impaired, and he has no need of special education or services related to his education, but only an accommodation of his diabetic condition that is medically necessary whether Luke is in school or not.
New Jersey had elected to participate in the IDEA program. Its implementing statutes and regulations provide further evidence of the inapplicability of the IDEA to Luke. See N.J.S.A. 18A:46-1 to -46; N.J.A.C. 6A:14-1.1 to -10.2. The New Jersey legislation defines handicapped children as
any child who is mentally retarded, visually handicapped, auditorily handicapped, communication handicapped, neurologically or perceptually impaired, orthopedically handicapped, chronically ill, emotionally disturbed, socially maladjusted, multiply handicapped, autistic, or pre-school handicapped.
[N.J.S.A. 18A:46-1.]
Luke fits within none of these categories.
The CLC argues that the IDEA as adopted in New Jersey is applicable and preempts this case because Luke needed the type of "related services" described in N.J.S.A. 18A:46-6. That provision requires in relevant part that
each board of education shall ... identify and ascertain, according to rules promulgated by the commissioner with the approval of the State board, those children between the ages of three and five years who require and who would be benefited by special education programs and services, which may prevent their handicaps from becoming more debilitating.
However, under the statutory definition Luke is not handicapped and, moreover, he is in no need of special education. Accordingly the IDEA and its New Jersey counterpart are simply irrelevant to this case. The similar conclusion of the motion judge is affirmed.

III.
As a final matter, we address Ellison's argument that the court erred in granting summary judgment on plaintiffs' claim of handicap discrimination under the NJLAD.[1] In doing so, we must view the facts presented in a light most favorable to plaintiffs, and we therefore assume that Luke's admission to the CLC was rescinded as the result of its unwillingness to accommodate his diabetic condition. Brill, supra, 142 N.J. at 540, 666 A.2d 146.
In granting summary judgment, the motion judge held on the basis of his interpretation of the NJLAD and implementing regulations that the requirement of reasonable accommodation was applicable only to employment cases. He found that in a case alleging discrimination in a public accommodation such as this, the only focus should be on whether the defendants acted with an actual or apparent design to discourage present or future use of the public accommodation by handicapped persons. See Franek v. Tomahawk Lake Resort, 333 N.J.Super. 206, 216, 754 A.2d 1237 (App. Div.) (utilizing that standard), certif. denied, 166 N.J. 606, 767 A.2d 484 (2000). Further, the judge rejected federal precedent regarding public accommodations decided pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C.A. § 12182, *19 finding that statute to specifically prohibit a failure to make reasonable accommodations, whereas the NJLAD contained no such prohibition. The court then found that because the CLC had not discriminated against Luke upon initial admission, although it knew then of his diabetic condition, it could not be held liable when it later withdrew his acceptance when informed that a reasonable accommodation to his handicap was required.
We do not agree with the conclusion of the motion judge, finding that the law as implemented through administrative regulations is broader in scope than the motion judge recognized.
Subchapter 4 of the New Jersey Administrative Code, the subchapter addressing discrimination in places of public accommodation, is designed to
implement the provisions of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to 49, as it pertains to unlawful discrimination against people with disabilities by the owners, lessees, proprietors, managers, superintendents, agents or employees of any place of public accommodation.
[N.J.A.C. 13:13-4.1 ("Purpose").]
Under N.J.A.C. 13:13-4.11 ("Reasonable Accommodation"),
(a) An owner ... or employee of any place of public accommodation shall make such reasonable modifications in policies, practices, or procedures, as may be required to afford goods, services, facilities, privileges, advantages, or accommodations to a person with a disability, unless the owner ... or employee of the place of public accommodation demonstrates that making the modifications would impose an undue burden on its operation.
(b) In determining whether an accommodation is unreasonable because it will impose an undue burden on the operation of a place of public accommodation, factors to be considered include:
1. The overall size of the business which runs the place of public accommodation with respect to the number of employees, number and type of facilities, and size of the budget;
2. The nature and cost of accommodation sought; [and]
3. Whether the accommodation sought will result in a fundamental alteration to the goods, services, program or activity offered....
Nothing in the plain language of these regulations limits their applicability to any particular form of public accommodation or excludes their applicability to a pre-school such as the CLC. It does not comport with the statutory and judicial requirement that the NJLAD be construed broadly to restrict the requirement of reasonable accommodation exclusively to the employer/employee relationship. The motion judge's interpretation of Franek as compelling a different conclusion, we find, was mistaken. In Franek, the cause of action was based upon acts of the defendant that discouraged access to a public picnic area by handicapped persons such as the plaintiff's mother and upon statements that provided evidence of an intent to discriminate. We limited plaintiff's cause of action to fit these factual circumstances. 333 N.J.Super. at 215-16, 754 A.2d 1237. In the present case, the essence of plaintiffs' cause of action is a failure of reasonable accommodation by the CLC after it had admitted Luke for the 2002-2003 school term. We find no grounds to reject plaintiffs' claim simply because it does not resemble that in Franek. See Viscik v. Fowler Equip. Co., 173 N.J. 1, 19, 800 A.2d 826 (2002) (observing that reasonable accommodation is an issue in a handicap discrimination case when it is pled as *20 such); see also Borngesser v. Jersey Shore Med. Ctr., 340 N.J.Super. 369, 379-80, 774 A.2d 615 (App.Div.2001)(recognizing a cause of action for failure by a hospital to make reasonable accommodation for its patient's deafness).
Further, we disagree with the motion judge's conclusion that federal precedent construing the ADA cannot be utilized in this context because reasonable accommodation is statutorily required under federal law, whereas it is not specified by New Jersey law in this context. The same distinction exists with respect to statutory provisions governing discrimination in employment. Compare 42 U.S.C.A. § 12112(b)(5)(B) with N.J.S.A. 10:5-12a. Yet federal law has long provided guidance to our courts in this area. See, e.g., Viscik, supra, 173 N.J. at 13, 800 A.2d 826; Tynan v. Vicinage 13 of the Super.Ct. of N.J., 351 N.J.Super. 385, 396-97, 798 A.2d 648 (App.Div.2002) (noting that although the NJLAD does not specifically address reasonable accommodation for handicaps by employers, it is nonetheless required); Muller v. Exxon Research & Eng'g Co., 345 N.J.Super. 595, 606, 786 A.2d 143 (App.Div.2001); Seiden v. Marina Assocs., 315 N.J.Super. 451, 461 n. 1, 718 A.2d 1230 (Law Div.1998). As plaintiffs note, the requirement of reasonable accommodation was recognized by a court in imposing a preliminary injunction upon the dismissal of a child from private school for poor performance in the analogous context of a student with alleged attention deficit hyperactivity disorder. See Axelrod v. Phillips Academy, 36 F.Supp.2d 46, 50 (D.Mass.), vacated, injunction denied on other gr., 46 F.Supp.2d 72 (D.Mass.1999).
Nor do we find it dispositive that existing regulations regarding accommodations focus on structural modifications to increase accessibility and auxiliary aids and services such as interpreters, note-takers, special examination conditions and the like. N.J.A.C. 13:13-4.11 broadly requires reasonable modification in "policies, practices, or procedures" in this context. In light of the purpose of the NJLAD to ensure the absence of discrimination against persons with disabilities by places of public accommodation, we cannot find that a reasonable accommodation by a school for a medical condition such as diabetes falls outside the statute's purview simply because it is not a specific topic of an existing regulation.
We note, however, that the NJLAD requires only that "reasonable" accommodation be made for Luke's diabetic condition. After a careful review of the record in this case, we are unable to determine as a matter of law whether the CLC and its employees breached this statutory duty or even whether they in fact declined to undergo the training necessary to calibrate Luke's insulin pump and to program the delivery of insulin to him, finding that the issue must be resolved by a jury after a full exposition of the facts at trial. See, e.g., Chisolm v. McManimon, 275 F.3d 315, 329-30 (3d Cir.2001).
In this connection, we note the potential applicability as a defense of N.J.A.C. 13:13-4.8, governing conduct toward the handicapped when there is a reasonable probability of serious harm. We also note as factors relevant to the jury's consideration of the "reasonableness" of the CLC's position, in addition to the factors enumerated in N.J.A.C. 13:13-4.11(b), such matters as the timing of Ellison's meeting with school employees in relationship to the start of the school year; the lack of medically trained personnel on CLC's staff; the recommendation that teachers obtain their training in the use of the pump from a medical professional before Luke's care could be entrusted to them; the ease or difficulty of calibrating the pump; the need for such calibration during the hours *21 that Luke was scheduled to attend the CLC; and the practices of other comparable pre-schools in the area with respect to the accommodation of children with Type I diabetes who utilized insulin pumps.
We therefore reverse the summary judgment entered against plaintiffs and remand the matter for trial, at which time a jury can resolve the factual issues that surround the events of September 5, 2002 and determine whether a violation of the NJLAD on the part of the CLC and Pauska has occurred.
Reversed and remanded for trial.
NOTES
[1] That Luke qualifies as handicapped under N.J.S.A. 10:5-5q and that the right to be free from discrimination set forth in the NJLAD applies to handicapped persons under N.J.S.A. 10:5-4 has not been contested.