NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2424-12T1

J.T., ON HER OWN BEHALF,
ON BEHALF OF HER MINOR CHILD,
A.T., AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED,

     Plaintiffs-Appellants,

v.

DUMONT PUBLIC SCHOOLS, THE DUMONT
PUBLIC SCHOOLS BOARD OF EDUCATION,
EMANUELE TRIGGIANO, IN HIS OFFICIAL
CAPACITY AS SUPERINTENDENT OF THE
DUMONT PUBLIC SCHOOLS, AND PAUL
BARBATO, IN HIS OFFICIAL CAPACITY
AS DIRECTOR OF SPECIAL SERVICES
FOR THE DUMONT PUBLIC SCHOOLS,

     Defendants-Respondents.

---

> **APPROVED FOR PUBLICATION**
>
> **November 24, 2014**
>
> **APPELLATE DIVISION**

---

Argued April 1, 2014 — Decided  November 24, 2014

Before Judges Messano, Hayden, and Lisa.

On appeal from the Superior Court of New
Jersey, Chancery Division, Bergen County,
Docket No. C-139-12.

John D. Rue argued the cause for appellant
(Law Offices of John Rue, attorneys; Maryam
Jazini Dorcheh (White & Case), Jack E. Pace,
(White & Case) of the New York bar, admitted
pro hac vice, and Peter E. Wilhelm
(White & Case) of the New York bar, admitted
pro hac vice, on the brief).

Eric L. Harrison argued the cause for respondents (Methfessel & Werbel, attorneys; Mr. Harrison and Boris Shapiro, on the brief).

Ruth Deale Lowenkron argued the cause for amici curiae Council of Parent Attorneys and Advocates, Disability Rights New Jersey, Education Law Center, New Jersey Special Education Practitioners, Statewide Parent Advocacy Network, and the Special Education Clinic of Rutgers University - Newark (Education Law Center, attorneys; Ms. Lowenkron, on the brief).

The opinion of the court was delivered by

HAYDEN, J.A.D.

The issue before us is whether one component of an appropriate special education placement violates the Law Against Discrimination's (LAD), N.J.S.A. 10:5-1 to -42, prohibition against discrimination due to a disability. Plaintiff J.T., on behalf of herself, her minor son A.T., and all Dumont students similarly situated, appeals from the Chancery Division order granting summary judgment in favor of defendants. Plaintiffs allege that defendants failed to accommodate the putative class[1] members' disabilities in violation of the LAD by refusing to

---

[1] The complaint defines the putative class as all "kindergarten students in the District, or who may be kindergarten students in the District in the future, [who] are classified as requiring special education services, or who may be so classified in the future, and [who] reside within the town of Dumont." This class consisted of at least ninety-six students. The complaint alleged that A.T.'s claims are "typical of those of the [c]lass as a whole."

provide the special education services that the special needs students require in their neighborhood schools. Defendants are the Dumont school district, the Board of Education, the district superintendent, and the director of special services. Because plaintiffs did not demonstrate they were deprived of a benefit due to a disability and thus failed to make a prima facie showing of disability discrimination under the LAD, we affirm.

I.

The record reveals that J.T. and her minor son A.T. resided in Dumont, a town of about two square miles. The school district of Dumont has four elementary schools: Selzer, Grant, Honiss, and Lincoln. In both the 2008-2009 and 2009-2010 school years, about 180 students attended kindergarten within the district. The school district's policy provided that generally children were to attend their neighborhood schools. An exception to the policy was when the child's Individualized Education Plan (IEP) required special education services that were provided in a different school.

Beginning in the 2008-2009 school year, the district offered an inclusion kindergarten class in addition to a self-contained kindergarten class. The self-contained classroom had only children whose needs, according to their IEPs, warranted a full-time special education teacher. The inclusion classroom,

on the other hand, had both general education and special education students who were taught the regular curriculum by a full-time general education teacher with the part-time assistance of a special education teacher. The amount of time that the special education teacher spent in the inclusion classroom varied according to the combined requirements of the children's IEPs. Both the inclusion and self-contained classes were located in the same school building each year.

In each of the 2008-2009 and 2009-2010 school years, four special needs children were placed in the inclusion kindergarten classroom as required by their IEPs.[2] In the 2010-2011 school year, only one student with disabilities was in the inclusion class. Each year during this same period, depending on their individual educational needs as determined by their IEPs, several special education children were placed in the self-contained kindergarten classroom, in out-of-district placements, or in regular kindergartens in their neighborhood schools because they needed only support services, not special education teachers, to carry out their IEPs.[3]

---

[2] Inclusion classrooms may contain up to eight students with special needs. N.J.A.C. 6A:14-4.6(n).

[3] At least one child was in a regular education classroom without special services because his parents declined the inclusion placement in favor of placement in the neighborhood school
(continued)

When A.T. was three years old, he was diagnosed with childhood autism, a pervasive developmental disorder. In the 2008-2009 school year, pursuant to his IEP, A.T. attended preschool in the district's inclusion classroom in Selzer, his neighborhood school, for half the day and spent the remainder of the day in an out-of-district self-contained program.

In May 2009, the district personnel and J.T. met to discuss A.T.'s IEP for his upcoming kindergarten year. J.T. and the district agreed that A.T. needed some special education services. The district personnel proposed moving him from a self-contained class to the district's inclusion class, to be held in Grant. The inclusion class was taught by a regular education teacher who followed a regular education curriculum. The class also had fewer students than a regular education kindergarten class and provided services according to each special education student's IEP with the assistance of a part-time special education teacher.

In contrast, J.T. wanted A.T. to attend a general education classroom at his home school, Selzer, with the supports provided in that classroom. The district personnel did not think this option met A.T.'s special needs; rather, they reasoned that A.T.

(continued)
without a special education teacher's services.

needed the integrated services, smaller class size, and in-class special education teacher to enable A.T. to retain and generalize information in order to meet the goal of readying him for a regular education classroom for the next year. Although J.T. did not agree, the final IEP designated A.T.'s educational placement as the inclusion kindergarten class at Grant.

In June 2009, J.T. filed a due process petition with the New Jersey Department of Education challenging the appropriateness of the IEP's inclusion placement at Grant rather than a regular education placement at Selzer. In September 2009, A.T. began attending the inclusion kindergarten class at Grant. Shortly thereafter, on September 28, 2009, plaintiffs filed a class action complaint in federal court alleging violations of (1) the Individuals with Disabilities Education Act (IDEA), 20 U.S.C.A. §§ 1400-1485, based on the district's failure to educate children in the least restrictive environment, (2) Section 504 of the Rehabilitation Act (RA), 29 U.S.C.A. § 794, due to discrimination against class members, and (3) the LAD for failing to accommodate class members in their neighborhood school. In November 2009, plaintiffs withdrew their due process petition.

While the federal litigation was pending, A.T. completed his kindergarten year in the inclusion class. The parties do

not dispute that A.T. benefitted educationally, emotionally, and socially from the inclusion placement. For his first grade year, the parents and district personnel agreed that it was appropriate to place him in the regular education classroom in Selzer with some special education services.

After completion of discovery in federal court, both sides moved for summary judgment. The district court granted summary judgment in favor of defendants on the IDEA and RA claims, finding a lack of subject matter jurisdiction because there was no legally cognizable injury and plaintiffs failed to exhaust administrative remedies. The court noted that "plaintiffs are also not claiming that A.T. suffered a deprivation of educational benefits. Thus, Plaintiffs have not demonstrated either 'a loss of educational opportunity for the student,' or a serious deprivation of the parents' 'participation rights,' or a 'deprivation of educational benefits . . . .'" J.T. v. Dumont Pub. Schs., No. 09-4969 (MAH), 2012 U.S. Dist. LEXIS 42671, at *34-35 (D.N.J. Mar. 28, 2012) (internal citations omitted).

In finding that plaintiffs failed to establish a concrete and particularized harm, the court reasoned:

> Plaintiffs may not establish their standing based solely on the argument that Dumont committed a procedural violation by failing to consider whether the exact same services should be provided in a child's neighborhood school. Crucially, Plaintiffs have failed

> to identify, or they have abandoned, assertions that Dumont's policy resulted in the loss of an educational opportunity, seriously deprived parents of participation rights, or deprived students of educational benefits.
>
> [Id. at *42.]

The court also found that plaintiffs' voluntary failure to pursue their administrative remedies was fatal to their complaint. According to the court, "[t]he evidence does not support Plaintiffs' claim that Dumont used the inclusion class to systematically avoid the IDEA's requirement to individually consider students' needs when making placement decisions." Id. at *54. On the issue of whether the placement was the least restrictive environment, the court pointed out that plaintiffs and any kindergartener affected by an inclusion placement, "can [and must] seek redress on this substantive claim through the administrative process." Id. at *55.

Addressing plaintiffs' claim that placement in the non-neighborhood school was a violation of the RA, the court found that "[f]or the same reasons Plaintiffs have failed to show that they suffered an injury under the IDEA, Plaintiffs have failed to establish that J.T. has been discriminated against due to his disability." Id. at *58. The court specifically found that plaintiffs' RA claim of discrimination due to not attending one's neighborhood school was based upon the same facts as their

IDEA claim. Ibid. Having dismissed the federal claims for lack of subject matter jurisdiction, the district court declined to exercise supplemental jurisdiction over the LAD claims and dismissed them without prejudice.

## II.

Shortly after the dismissal of the federal complaint, plaintiffs filed a civil complaint in the Chancery Division. The complaint alleged violations of the LAD, including that defendants discriminated against the putative class members due to their disabilities by (1) forcing them to receive required special education services in a school other than their neighborhood school, (2) failing to consider the placements or the provision of transportation on an individual basis, and (3) segregating class members due to their special education needs. Plaintiffs sought a declaration that defendants had failed to obey the LAD and asked for an order requiring, among other relief, that all class members be educated in their neighborhood school whenever possible, an in-class special education teacher be furnished in each of the class members' neighborhood school, and a court-appointed Special Master paid for by the district to review all IEPs and determine defendants' compliance with these requirements.

After agreeing to rely on the discovery obtained in the federal case, the parties moved for partial summary judgment as to liability under the LAD. In analyzing plaintiffs' LAD disability accommodation claim, the judge found it was undisputed that A.T. had a disability and that the school district was an entity required to make reasonable accommodations unless the school district demonstrated that such accommodations would impose an undue burden to its operation. N.J.A.C. 13:13-4.11. Employing the standard from the Americans with Disabilities Act (ADA), 42 U.S.C.A. §§ 12101-12213, the judge found that to state a claim for failure to accommodate, a plaintiff must show that he or she (1) has a disability; (2) is otherwise qualified to participate in a program; and (3) was denied the benefits of the program or discriminated against because of the disability.

The judge noted that under the IDEA, centralization of programs was lawful and determined that plaintiffs failed to show that the centralization of the program deprived them of a benefit. Based upon the circumstances present, the judge reasoned that program accessibility, rather than facility accessibility, was key to the implementation of the ADA, and by implication the LAD.

A-2424-12T1

The judge found that plaintiffs established the first two elements but did not show that the district deprived A.T. of a cognizable benefit or program due to a disability. "To the contrary, the [p]laintiffs received all the necessary educational benefits, programs and extracurricular resources required under the law." Although the judge recognized that there was a pedagogical benefit to attending one's neighborhood school, "all other things being equal," he emphasized that A.T. thrived in his kindergarten class, educationally and socially, and that there was no evidence that A.T. or any of the putative class members suffered actual harm by not attending his or neighborhood school or by being bused to school. Accordingly, the judge dismissed the complaint. This appeal followed.

While this appeal was pending, the Third Circuit upheld the district court's decision dismissing plaintiffs IDEA and RA claims on April 26, 2013. J.T. v. Dumont Pub. Schs., 533 Fed. App'x 44, 55 (3d Cir. 2013). The circuit court emphasized that "IDEA permits schools to provide special education services in a centralized location." Id. at 49. The circuit court concurred that there was no substantive harm shown to A.T. or any of the putative class members as there was "no denial of services, opportunities, participation, or benefits." Id. at 50. The circuit court also rejected plaintiffs' claim under the RA,

reasoning that "when [RA] claims are based on violations of the IDEA, the [RA] claims are derivative of the IDEA claims."  Id. at 52 (internal citations omitted).

In addition, the circuit court explicitly rejected plaintiffs' claim that they suffered additional injury under the RA because they were bused out of their neighborhood and located in a different part of the school from the regular education classrooms, thus marking them as disabled in the eyes of their peers.  Ibid.  The court found that Doe v. National Board of Medical Examiners, 199 F.3d. 146, 153 (3d Cir. 1999), which held that under certain circumstances, merely identifying a person as disabled can be a violation of the RA, did not support plaintiffs' RA claims.  J.T., supra, 533 Fed. App'x at 52.  The court found that busing students in compliance with their IEPs was not such a circumstance, stating "[i]n contrast, IDEA requires school districts to identify students in need in order to provide them special education services.  Busing students to a centralized location for special services may be integral to IDEA compliance and, depending on the IEP, is sought by many parents of children with special needs."  Ibid. (internal citations omitted).  The court also stressed that "the procedure through which the school district placed A.T. in the inclusion

class is not rendered a systemic issue simply because J.T. raises it in a putative class action."[4]  Id. at 54.

### III.

On appeal, plaintiffs argue that the trial judge erred in holding that they failed to establish a prima facie case under the LAD for disability discrimination.  Plaintiffs contend that attending one's neighborhood school is a cognizable benefit protected under the LAD, and that the judge incorrectly distinguished between program and facility accessibility in analyzing the benefit.  Further, plaintiffs contend that the judge's determination that plaintiffs provided no proof of actual harm was erroneous because plaintiffs' expert's report described such harm.

Amici, consisting of several non-profit organizations that advocate for the rights of children with disabilities, support plaintiffs' arguments.  They submit that studies show that children with disabilities benefit more from being in regular education classrooms with regular education students, rather

---

[4]  In considering J.T.'s failure to exhaust the IDEA administrative remedies, the court observed that while J.T. framed the complaint as an overall challenge to a general school policy, the determination of the effect of any district policy on each IEP entailed a factually-intensive inquiry, which the IDEA administrative process was designed to address, noting that"[t]his claim addresses only one component of the school district's educational program . . . ."  Id. at 54.

than being segregated in special education classes with only disabled students. They also contend that children are stigmatized as different by having to take a small school bus to their programs. Amici further argue that the school district's policy of centralizing the inclusion kindergarten class denied the putative class members of benefits they would have enjoyed if they had attended integrated classrooms in their neighborhood schools.

Defendants maintain that no LAD violation occurred because under the IDEA and state law, a school district has discretion in determining the location and type of services that a child needs to receive an appropriate education in accordance with the child's IEP. They also argue that because plaintiffs' LAD claims are based upon the same core facts as their IDEA claims, the LAD claims are derivative of the IDEA claims and fail for the same reasons as the IDEA and the RA claims. Defendants further contend that plaintiffs failed to establish that A.T. was deprived of a benefit or, in the alternative, submit that the IEPs were a reasonable accommodation based upon each child's individual disability. Finally, defendants urge us to affirm the trial court's decision because the record does not contain any proof of actual harm.

We begin with a review of the applicable legal principles that guide our analysis. We first address the federal law concerning education of children with disabilities. "Although education is primarily a concern of state and local governments," education of children with disabilities "is regulated by a complex scheme of federal and state statutes and administrative regulations." Lascari v. Bd. of Educ., 116 N.J. 30, 33 (1989). The IDEA ensures that all children with disabilities[5] have available to them a free appropriate public education (FAPE) in the least restrictive environment that provides special education and related services to meet their unique needs and prepare them for further education, employment, and independent living, and ensures that the rights of such children and their parents are protected. See 20 U.S.C.A. §§ 1400(d)(1)(A),(B). New Jersey has adopted a statute, N.J.S.A. 18A:46-1 to -55, and regulations, N.J.A.C. 6A:14-1.1 to -9.2, to comply with the extensive goals and procedures established in the IDEA in order to receive significant federal funding. See 20 U.S.C.A. § 1412.

---

[5] A "child with a disability" includes children with intellectual disabilities, speech and language impairments, serious emotional disturbance, and specific learning disabilities, who, by reason thereof, need special education and related services. 20 U.S.C.A. § 1401(30)(A).

Central to the IDEA and the provision of a FAPE is the IEP, a comprehensive written plan developed by a team consisting of the student's parents, teachers, and representatives of the local educational agency.[6]  20 U.S.C.A. § 1414(d).  The IEP's ultimate purpose is to tailor the educational services in order to meet the special needs resulting from the student's disability and to ensure that the student receives the benefits of a FAPE.  20 U.S.C.A. §§ 1412(a)(1), (4).  The IEP is generally developed each year by the entire IEP team.  20 U.S.C.A. §§ 1414(d)(2), (4).  Regarding the development of this important comprehensive plan, the IDEA accords "significant deference to the choices made by school officials as to what constitutes an appropriate program for each student."  Ridley Sch. Dist. v. M.R., 680 F.3d 260, 277 (3d Cir. 2012).

The IDEA mandates that, to the maximum extent possible, children with disabilities must be educated in the least restrictive environment.  20 U.S.C.A. § 1412(a)(5); N.J.A.C.

---

[6] Under the New Jersey Administrative Code, an IEP is defined as "a written plan which sets forth present levels of academic achievement and functional performance, measurable annual goals and short-term objectives or benchmarks . . . ."  N.J.A.C. 6A:14-1.3.  It refers to an "integrated, sequential program of individually designed instructional activities and related services necessary to achieve the stated goals and objectives.  This plan shall establish the rationale for the student's educational placement[] [and] serve as the basis for program implementation. . . ."  Ibid.

6A:14-1.1(b)(5). This environment is one that, to the greatest extent possible, educates disabled children together with children who are not disabled in the same school the disabled child would attend if the child was not disabled. 20 U.S.C.A. § 1412(a)(5); N.J.A.C. 6A:14-4.2. Specifically, "[u]nless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled." Murray v. Montrose Cnty. Sch. Dist., 51 F.3d. 921, 929 (10th Cir.), cert. denied, 516 U.S. 909, 116 S. Ct. 278, 133 L. Ed. 2d 198 (1995) (internal citations omitted); see also N.J.A.C. 6A:14-14.2(a)(7). The Third Circuit has interpreted this to require that a disabled child be placed in the least restrictive environment that will provide the child with a "meaningful educational benefit." T.R. v. Kingwood Twp. Bd. of Educ., 205 F.3d 572, 578 (3d Cir. 2000). Additionally, in the Third Circuit, there is a presumption in favor of placing the child in the neighborhood school if possible. See Oberti v. Bd. of Educ., 995 F.2d 1204, 1224 n.31 (3d Cir. 1993).

Nevertheless, the IDEA does not impose an absolute obligation to place a child in his or her neighborhood school; rather, the school district is required to take into account geographical proximity of placement. Barnett v. Fairfax Cnty. Sch. Bd., 927 F.2d 146, 153 (4th Cir.), cert. denied, 502 U.S.

589, 112 S. Ct. 175, 116 L. Ed. 2d 138 (1991); White v. Ascension Parish Sch. Bd.,[7] 343 F.3d 373, 380 (5th Cir. 2003) (school districts have discretion on the location of special education services); see also AW v. Fairfax Cnty. Sch. Bd., 372 F.3d 674, 682 (4th Cir. 2004) (finding no mandate that the student must be assigned to the closest school). School districts are permitted to centralize services and the preference for neighborhood schooling is one of many factors which the school district is entitled to consider. See Barnett, supra, 927 F.2d at 153. Further, the school district is not required to move a program or service to a child's neighborhood school. See Kevin G. v. Cranston Sch. Comm., 130 F.3d. 481, 482 (1st Cir. 1997) (holding that a school district was not required to move a nurse to a student's neighborhood school to comply with the IDEA), cert. denied, 524 U.S. 956, 118 S. Ct. 2377, 141 L. Ed. 2d 744 (1998); see also Urban v. Jefferson Cnty. Sch. Dist., 89 F.3d 720, 728 (10th Cir. 1996); M.A. v. Voorhees Twp. Bd. of Educ., 202 F. Supp. 2d 345, 363-64 (D.N.J. 2002) (holding that a school district was not required to make dramatic changes

---

[7] Indeed, all federal circuits that have considered the issue (First, Third, Fourth, Fifth, Sixth, Eighth, Ninth, and Tenth) recognize that there is no right to a neighborhood school assignment under the IDEA. White, supra, 343 F.3d at 381.

to its program in order for a child to attend his neighborhood school), aff'd, 65 Fed. App'x 404 (3d Cir. 2003).

If the parents disagree about the contents of the IEP, the IDEA provides two methods of seeking redress. They can request a due process hearing,[8] which in New Jersey entails a full-fledged adjudicatory hearing at the Office of Administrative Law, or they can file an administrative complaint with the designated state education agency, which must investigate and issue a decision within sixty days. See 34 C.F.R. § 300.152. A party aggrieved by the decision may bring an appeal from the administrative proceedings in any state or federal district court regardless of the amount in controversy. 20 U.S.C.A. § 1415(i)(2)(A). Generally, plaintiffs must exhaust these administrative remedies before seeking relief under the IDEA as well as under several other federal laws:

> Nothing in this title [20 U.S.C.A. §§ 1400 et seq.] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973 [29 U.S.C.A. §§ 790 et seq.], or other Federal laws protecting the rights of children with disabilities, except that

---

[8] At a due process hearing, the student may bring complaints under the IDEA "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child[.]" 20 U.S.C.A. § 1415(b)(6)(A).

> before the filing of a civil action under such laws seeking relief that is also available under this part [20 U.S.C.A. §§ 1411 et seq.], the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this part.
>
> [20 U.S.C.A. § 1415(l).]

Thus, to the extent that any federal action seeks relief that is available under the IDEA, the administrative procedures in the IDEA must first be exhausted. N.J. Prot. & Advocacy, Inc. v. N.J. Dep't of Educ., 563 F. Supp. 2d 474, 484 (D.N.J. 2008). The exhaustion rule permits "agencies to exercise discretion and apply their expertise, to allow the complete development of the record before judicial review, to prevent parties from circumventing the procedures established by Congress, and to avoid unnecessary judicial decisions by giving the agency an opportunity to correct errors." Urban, supra, 89 F.3d at 724 (citing Ass'n for Cmty. Living v. Romer, 992 F.2d 1040, 1044 (10th Cir. 1993)). Further, "[t]his provision bars plaintiffs from circumventing IDEA's exhaustion requirement by taking claims that could have been brought under IDEA and repackaging them as claims under some other statute" such as the RA and the ADA. Jeremy H. v. Mount Lebanon Sch. Dist., 95 F.3d. 272, 281 (3rd Cir. 1996).

In the prior federal litigation, plaintiffs contended, albeit unsuccessfully, that defendants' policy of centralizing the provision of special education services and failing to provide special education services at each child's neighborhood school violated the RA. The RA provides that anyone receiving federal funds may not discriminate against an "otherwise qualified individual with a disability . . . ." 29 U.S.C.A. § 794(a). The education regulations promulgated under Section 504 of the RA generally conform to the standards established in the IDEA. See 34 C.F.R. §§ 104.31 to -39. Indeed, the IDEA and the RA are "built around fundamental notions of equal access to state programs and facilities" and thus "their substantive requirements . . . have been interpreted to be strikingly similar." Smith v. Robinson, 468 U.S. 992, 1017, 104 S. Ct. 3457, 3471, 82 L. Ed. 2d 746, 768 (1984), superseded on other grounds by 20 U.S.C.A. 1415(i)(3)(B).

Comparable to the RA, the ADA protects against disability discrimination by providing that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.A. § 12132. The ADA regulations generally conform to the regulations promulgated

21

under Section 504 of the RA. See 28 C.F.R. § 35.103(a). "With limited exceptions, the same legal principles govern ADA and RA claims." CG v. Pa. Dep't of Educ., 734 F.3d 229, 235 (3d Cir. 2013).

Relying on these well-recognized similarities, federal courts have routinely concluded that "if a disabled child is not entitled to a neighborhood placement under the IDEA, he [or she] is not entitled to such a placement under [the RA]." Urban, supra, 89 F.3d at 728; see also Miller v. Bd. of Educ., 565 F.3d 1232, 1246 (10th Cir. 2009) (noting that "complying with the IDEA is sufficient to disprove educational discrimination" under the RA); N.L. v. Knox Cnty. Schs., 315 F.3d 688, 695-96 (6th Cir. 2003) (noting that "precedent has firmly established that section 504 claims are dismissed when IDEA claims brought on the theory of a denial of free appropriate public education are also dismissed."); Taylor v. Altoona Area Sch. Dist., 737 F. Supp. 2d 474, 487 (W.D. Pa. 2010) (noting that if an IDEA claim fails, ADA and RA claims brought on the same core facts "must also fail") (internal citations omitted); Barnett, supra, 927 F.2d at 154-55 (finding school board did not violate the IDEA or the RA by not delivering program for hearing impaired student in child's neighborhood school). Conversely, if the IDEA claim and the RA or the ADA claims do not share a similar factual basis,

they will be addressed separately.  See CG, supra, 734 F.3d at 235; Taylor, supra, 737 F. Supp. 2d at 487-88; Hornstine v. Twp. Of Moorestown, 263 F. Supp. 2d 887, 901 (D.N.J. 2003).

While the IDEA concerns the affirmative duty to provide a public education to disabled students, the RA and the ADA "embody the negative prohibition against depriving disabled students of public education."  CG, supra, 734 F.3d at 234 (citing W.B. v Matula, 67 F.3d 484, 492-93 (3d Cir. 1995)). Hence, the IDEA provides a remedy for "inappropriate educational placement decisions, regardless of discrimination," while the ADA and the RA prohibit and provide a remedy for discrimination. Ibid. (citing Hornstine, supra, 263 F. Supp. 2d at 901). Generally, failure to provide a FAPE violates the IDEA as well as the ADA and the RA[9] "because it deprives disabled students of a benefit that non-disabled students receive simply by attending school in the normal course — a free, appropriate public education."  Id. at 235.  Conversely, the provision of a FAPE generally rules out discrimination claims under the RA and the ADA for benefits available under the IDEA.  See, e.g., Miller,

---

[9] We recognize that as the definition of disability is different under the IDEA and the RA, violation of the IDEA is not evidence of a per se violation of the RA.  Andrew M. v. Delaware Cnty. Office of Mental Health & Mental Retardation, 490 F.3d 337, 349 (3d Cir. 2007).

supra, 565 F.3d. at 1246; H.D. v. Cent. Bucks Sch. Dist., 902 F. Supp. 2d 614, 628 (E.D. Pa. 2012).

IV.

We now turn to the LAD's protection from disability discrimination, the basis of plaintiffs' complaint. In New Jersey, persons with disabilities are protected from discrimination by the LAD. N.J.S.A. 10:5-4. In relevant part, the LAD provides:

> All persons shall have the opportunity to obtain . . . all the accommodations, advantages, facilities, and privileges of any place of public accommodation . . . without discrimination because of . . . disability . . . . This opportunity is recognized as and declared to be a civil right.
>
> [N.J.S.A. 10:5-4.]

"A place of public accommodation" includes "any kindergarten, primary and secondary school[.]" N.J.S.A. 10:5-5(l).

Our courts broadly interpret the LAD to further its purpose "to eradicate the 'cancer of discrimination[.]'" Ellison v. Creative Learning Ctr., 383 N.J. Super. 581, 588 (App. Div. 2006) (internal citations omitted). The regulations implemented in furtherance of the LAD similarly provide that "the remedial provisions of the statute will be given a broad construction and its exceptions construed narrowly." N.J.A.C. 13:13-1.2(a). The LAD must be construed to prohibit any unlawful discrimination

24

against any person because such a person is disabled. N.J.S.A. 10:5-4.

The LAD public accommodation regulations provide that

> (a) It shall be unlawful for . . . any place of public accommodation to refuse, withhold from or deny an individual, either directly or indirectly, on account of that person's disability or perceived disability, access to any of the accommodations, advantages, facilities or privileges of a place of public accommodation . . . [and] to discriminate against a person with a disability in the price, eligibility criteria, methods of administration, standards, terms, or conditions upon which access to such accommodations, advantages, facilities or privileges may depend.
>
> [N.J.A.C. 13:13-4.3(a).]

N.J.A.C. 13:13-4.4(a) requires a place of public accommodation to "afford goods, services, facilities, privileges, advantages, and accommodations . . . in the most integrated setting" and "to the extent reasonable[.]" And N.J.A.C. 13:13-4.11(a) requires a place of public accommodation to accommodate a disabled person to the extent reasonable unless providing the accommodation "would impose an undue burden" on the place of public accommodation.

To determine the extent of the protection afforded to disabled persons under the LAD, we must look to the analytical framework of the RA and the ADA. Lasky v Moorestown Twp., 425 N.J. Super. 530, 538 (App. Div.), certif. denied, 212 N.J. 198

(2012); See also Ensslin v. Twp. Of N. Bergen, 275 N.J. Super. 352, 364 (App. Div. 1994) (noting appropriateness of construing a state regulation based on federal law due to the correlation between state and federal law on disability discrimination), certif. denied, 142 N.J. 446 (1995). Indeed, the Supreme Court has recently observed that the Legislature has not "amended the LAD to afford rights to the disabled that are different from those found in Section 504 [of the RA] and the ADA . . . ." Victor v. State, 203 N.J. 383, 406 (2010); see also Chisolm v. McManimon, 275 F.3d 315, 324-25 n.9 (3d Cir. 2001) (analyzing an ADA claim "with the understanding that the principles will apply equally to the [RA] and the [LAD] claims").

Under the ADA and the RA standard for establishing a prima facie case of failure to accommodate a disability, a plaintiff must show that he or she (1) had a disability; (2) was otherwise qualified to participate in the activity or program at issue; and (3) was denied the benefits of the program or otherwise discriminated against because of his or her disability. Chambers v. Sch. Dist of Philadelphia Bd. of Educ., 587 F.3d 176, 189 (3d Cir. 2009); D.G. v. Somerset Hills Sch. Dist., 559 F. Supp. 2d 484, 503 (D.N.J. 2008); cf., Victor, supra, 203 N.J. at 407. If the plaintiff can meet this burden, the question then becomes whether the accommodation was reasonable. Lasky,

supra, 425 N.J. Super. at 539, 542-44; Ellison, supra, 383 N.J. Super. at 595-96. The defendant may argue as an affirmative defense that the requested accommodation created an undue burden on the defendant. Hall v. Saint Joseph's Hosp., 343 N.J. Super. 88, 108-09 (App. Div. 2001), certif. denied, 171 N.J. 336 (2002).

In this case, the trial court found that plaintiffs established the first two elements of a LAD failure-to-accommodate prima facie case, that A.T. was disabled and was otherwise qualified for a program or activity, but that plaintiffs did not establish the third element, that A.T. was deprived "a cognizable benefit or program." Applying the applicable RA and ADA legal principles, we agree.

When a disabled child is denied a FAPE, it violates the IDEA and the RA "because it is denying a disabled child a guaranteed education merely because of the child's disability. It is the denial of an education that is guaranteed to all children that forms the basis of the claim." Andrew M., supra, 490 F.3d at 350; C.G., supra, 734 F.3d at 235. The undisputed facts in this case show that A.T. received a FAPE and there was no evidence presented that any other class member did not or will not receive a FAPE. Under the IDEA and state law, this is precisely the special education benefit made available to A.T.

Accordingly, guided by the previously cited cases concerning the RA, the ADA, and the IDEA, we hold that, when a LAD discrimination claim concerns the special education benefits and related services available to a child under the IDEA, the program or benefit used to determine the prima facie test for disability discrimination is the provision of a FAPE. Relying further on the similarity between the RA, the ADA, and the LAD, we also hold that if a disabled child is not entitled to a neighborhood school placement under the ADA or the RA, he or she is not entitled to such placement under the LAD.

Plainly, the issue of the location of special education services is a component of the IEP process aimed at developing a FAPE. The same facts underlying A.T.'s IDEA claim and RA claim are the core facts in his LAD claim. Federal courts have routinely rejected claims that placement in a non-neighborhood school for purposes of receiving special education and related services is a form of disability discrimination under the RA or the ADA. See White, supra, 343 F.3d at 381. In fact, the Third Circuit rejected plaintiffs' claim of RA discrimination based on non-neighborhood school placement in affirming the dismissal of the federal litigation here. Plaintiffs have not cited and our research has not revealed any cases that held that the failure to provide a FAPE in the neighborhood school violated the RA or

the ADA.

Plaintiffs incorrectly seek to isolate one specific component of A.T.'s IEP, the inclusion class location, and assert that it violates the right to attend one's neighborhood school, purportedly a separate and distinct benefit from the educational benefits provided under the IDEA. Separation of one component of the FAPE from all the other services and considerations that went into the IEP in this case is not appropriate. We cannot agree that, for purposes of the three elements of the prima facie test, there is a separate stand-alone benefit of attending the neighborhood school unrelated to the provision of a FAPE. This argument has not been successful under the RA or the ADA and, based upon previously stated RA and ADA principles, it must fail here. Simply put, where the disabled child's placement is determined as part of the IDEA process, the program or benefit the school district must provide is the provision of a FAPE. Andrew M., supra, 490 F.3d at 350.

Plaintiffs argue further that centralization of special education services, although admittedly correct under the IDEA and federal and state special education regulations, denies a child access to his neighborhood school in violation of state and federal regulations requiring that all public facilities be accessible to persons with disabilities. Based upon RA and ADA

principles addressing special education benefits, this argument is also unpersuasive. Moreover, the district has not denied A.T. physical access to his neighborhood school; indeed, he attended Selzer for the pre-school class and for first grade. He did not attend Selzer for kindergarten because his IEP, aimed at providing a FAPE, called for him to be in an inclusion class, which was held at Grant. Thus, plaintiffs' reliance on regulations concerning physical access is misplaced here.

Additionally, we reject plaintiffs' contention that the provision of special transportation services to bus A.T. to his special education program constitutes a separate violation of the LAD. Transportation is a related service which cannot be segregated from the child's individual IEP and FAPE. The IDEA requires transportation to be provided as a related service when it is necessary to enable a child with a disability to benefit from education. 20 U.S.C.A. § 1401(26)(A). Thus, transportation is not a separate educational component but is a means to assist the child in receiving the FAPE as designed by the IEP. If an individual student is aggrieved by the provision or non-provision of transportation, he or she can file for due process under the IDEA and request a change. See Tyler W. v. Upper Perkiomen Sch. Dist., 963 F. Supp 2d 427, 436-37 (E.D. Pa. 2013) (FAPE provided despite lengthy bus ride to educational

placement); <u>Bonadonna v. Cooperman</u>, 619 <u>F. Supp.</u> 401, 415 (D.N.J. 1985) (district required to provide transportation to facility located distance from neighborhood school).

Contrary to plaintiffs' arguments, the cases upon which they relied do not provide support for their claims. <u>Oberti</u>, an IDEA case, highlighted the undisputed legal principle that, under the IDEA, the preferred placement for special education services is the least restrictive environment, but also acknowledged, as do all the cases concerning least restrictive environment, that the placement depends on the child's unique needs as determined by a properly constructed IEP. <u>Oberti</u>, <u>supra</u>, 995 <u>F.</u>2d at 1214-15. Importantly, <u>Oberti</u> underscores that the IDEA governs the decision on where the child receives special education services and if a child is aggrieved by the placement, the remedy is to file a due process petition alleging failure to comply with the IDEA. 20 <u>U.S.C.A.</u> 1415(b)(6). Here, plaintiffs seek to make an end run around the IDEA by dismissing the due process petition and repackaging the claim as a class action under the LAD.

Likewise, <u>Hornstine</u> is inapposite here. In <u>Hornstine</u>, the district court engaged in an extensive discussion about the overlapping of the IDEA, the RA, and the ADA and determined that the issue before it, a high school's qualification requirements

for valedictorian, was not part of the child's IEP and was not covered by the IDEA; hence, the plaintiff did not have to exhaust administrative remedies. Hornstine, supra, 263 F. Supp. 2d at 901-02, 913. In stark contrast, the inclusion class here is part of the IEP and part of the benefit made available to A.T. under the IDEA. Thus, Hornstine supports defendants' assertions that when the dispute is based upon benefits provided pursuant to the IDEA, the LAD claim is coextensive with the IDEA and the RA claims. Additionally, plaintiffs' reliance on D.G. is misdirected because there the school district did not provide any special education program or benefits, which supported the plaintiff's RA and LAD claims for failure to provide an educational benefit. D.G., supra, 559 F. Supp. 2d at 488-90.

No evidence in the record demonstrates that A.T. did not receive the appropriate educational program from the inclusion placement at Grant or that any of plaintiffs' rights under the IDEA were violated. Instead, it was acknowledged that placement in the inclusion class benefitted A.T., both educationally and socially. Nor were any facts provided that any other children did not receive a FAPE or were actually harmed. Rather, plaintiffs' expert made a sweeping claim that all children provided with special education services in a non-neighborhood school or provided with the related service of transportation,

are harmed by the stigma of being singled out as disabled. The expert never evaluated A.T. or any of the other putative class members nor did she identify the specific harm suffered by these children. Since A.T. received the educational benefit to which he was entitled under the IDEA, the Third Circuit found no evidence of harm under the IDEA or the RA, and we perceive no actual harm here under the LAD.

In sum, we conclude that for purposes of establishing a prima facie case of disability discrimination under the LAD where the facts concern the provision of special education and related services, the program or benefit measured under the third element is the provision of a FAPE. To be sure, when the discrimination claimed does not pertain to special education and related services, the particular benefit or program will be different. Because here, the alleged discriminatory component, the location of the services, was part of the comprehensive IEP developed to provide A.T. with a FAPE, and did so provide, plaintiffs have not demonstrated a prima facie claim for disability discrimination under the LAD.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION